# Richards's Appeal.

1. Injury to a plaintiff may not entitle him to restrain a defendant in the use of a material necessary to the successful production of an article of such prime necessity as good iron, especially if it be very certain that greater injury would ensue by granting than by refusing an injunction.

2. Where damages will compensate either the benefits received, or the loss suffered from a nuisance, equity will not interfere.

3. As a general rule, mischief or damage which is susceptible of compensation in damages, is not irreparable.

4. In equity a decree is not of right but of grace, and a chancellor will refuse to enjoin if in conscience it appear, he would do greater injury by enjoining than by leaving the party to his redress by a court and jury.

January 20th 1868.    Before THOMPSON, C. J., READ, AGNEW and SHARSWOOD, JJ.    STRONG, J., at Nisi Prius.

[Richards's Appeal.]

Appeal from the decree of the Court of Common Pleas of *Chester county.* In Equity: No. 22, to January Term. 1867.

The bill in this case was filed September 8th 1864, by L. Harry Richards against the Phœnix Iron Company.

The bill alleges that the plaintiff is possessed as tenant of a dwelling-house, &c., in Phœnixville, where he resides with his family, and a manufactory in the same place, where he manufactures cotton cloth; that the defendants own and occupy extensive premises in the same place, known as the Phœnix Iron Works, where they manufacture iron in various branches; that they have in operation several furnaces for the smelting of iron, 60 or 70 yards from the said dwelling, and 100 yards from the said factory; that within the last three months, or thereabouts, the defendants for the first time commenced and still continue the use of bituminous or semi-bituminous coal in their said furnaces; that the furnaces so using said coal emit large dense masses of black soot and smoke, which are borne on the air and pervade all parts of the said house and factory; that the said smoke is sulphurous, unwholesome and noxious to those inhabiting the said dwelling-house, and if its use be persisted in, threatens to compel the plaintiff to remove his family therefrom; that the said soot borne on the air alights on the furniture, tables and victuals in the said house, thus adding discomfort to the unhealthiness thereof; that the said soot and smoke are carried by the atmosphere into the said cotton factory, rendering the air noxious and unwholesome to those operating therein, and injuring the market value of the cotton cloth manufactured there; that the plaintiff has remonstrated with the defendants against the use of said coal in said furnaces, but they persist in its use, and claim the right to continue it; that if so continued, the injury inflicted and likely to ensue therefrom to the family of the plaintiff, and to the said dwelling and factory, is irreparable.

The bill prays that the defendants may be restrained "from the use of the said coal in the said furnaces, and from the emission of the sulphurous and noxious soot and smoke therefrom, unless, by the erection of such tall chimneys as are elsewhere in use for the purpose, they shall convey the soot and smoke therefrom to such a height as shall avoid doing injury to the plaintiff or the premises he occupies; and that the plaintiff may have such further and other relief as equity may require."

The principal matters set out in the answers to the interrogatories are as follows: The defendants admit the occupancy of the house and factory by the plaintiffs, and the carrying on of the iron works by themselves; that they use semi-bituminous coal at their works; that from 1827 to 1841 bituminous coal was used there as fuel; and from that time until 1857 it was used in the forge-fires, where the two were used mixed for puddling and heat-

ing until about June 1864, when semi-bituminous was used exclusively in the mills, or some of them, on said premises; that the nearest furnace is 232 feet distant from the said dwelling, and 202 feet distant from the factory. There are 70 furnaces on the premises, which cover about 6 acres, and are situated at intervals of about 25 to 50 feet from each other; the furnaces emit dense volumes of smoke, principally when the raw fuel is being thrown on the fire, and only for a few minutes; but not nearly so dense as was the case when bituminous coal was used, from 1827 to 1841; and at times some diluted portions of said smoke are carried into the buildings of the plaintiff.

The smoke is not sulphurous, or if so very slightly, and less so than the generality of anthracite coal. It is not unwholesome or noxious, though unpleasant and disagreeable to many persons unaccustomed to it. Whether soot is carried and alights on the tables and furniture of the houses in the neighborhood, the defendants cannot say, upon information or belief, but if so it must be in very small quantities; they deny, upon belief, that the smoke or soot is carried into the mill so as to injure the market value of the cloth made there.

The plaintiff has remonstrated, and he has been requested by defendants, but has neglected to propose any basis for remuneration which the defendants were and are willing to make, as far as is consistent with justice, and they have, notwithstanding such remonstrances, continued to prosecute their lawful business and use the said coal.

The defendants insist that the remedy of the plaintiff, if any he has, is at law.

The defendants, besides, set out in their answer the importance of semi-bituminous coals in making superior bar-iron; that to purchase plaintiff's whole property would be less injury to them than stopping the use of such coal, and the injury by such stoppage would be equal to $40,000 per annum; that their buildings, machinery, &c., have cost above $500,000; that there are employed about their business, including mining, more than 1000 persons; that the plaintiff took the house and factory long after the building of the furnaces, and whilst defendants were using a fuel emitting more smoke and soot; and that the annoyance is casual and temporary, depending on the direction of the wind and the state of the atmosphere.

The case was heard on bill and answer.

Butler, P. J., in an elaborate opinion, discussing the allegations of the bill and answer and the authorities, concludes:—"After having ascertained the matter complained of not to be a nuisance *per se*, I might possibly have rested, and there declined interference until it should be shown by a trial at law, to be a nuisance in fact. This undoubtedly was once the rule. But I think

it is not at present.    I have preferred to regard the criterion as being, not whether the matter complained of is a nuisance *per se*, but whether on the facts admitted or proven, it is *clearly and unquestionably* such in fact."

The injunction was refused.

Upon leave, the plaintiff filed a general replication, and George M. Rupert, Esq., was appointed examiner and master.

The master reported that the works of the defendants consisted of three mills—one built in 1837, one in 1846, and one in 1853—together with three blast furnaces adjoining them, built about 1846.   Puddling and heating furnaces, at first few in number, but increasing till they reached seventy, were built in all the mills, each having a separate stack.   These works have been running constantly night and day.   The first manufactures were nail, plate and bar iron—now, in addition, girders, car-axles and cannon. The business of the works has been constantly on the increase, and has from time to time required the erection of new works, and their enlargement and improvement : that they employ from 800 to 1000 hands.

The plaintiff's factory was built about 1828, and went into operation soon afterwards; the dwelling-house was built in 1830 : both before any of the mills of the defendants.

Bituminous coal was used at the works till 1840 or 1841 : about that time anthracite coal was used; in 1862 semi-bituminous coal was introduced and used in small quantities, mixing it with anthracite; from 1864 semi-bituminous coal has been used exclusively. Bituminous or semi-bituminous coal " always has been the only coal used in nearly all the principal manufactories of iron," in this and in other countries.   At the defendants' works, dense volumes of smoke and soot are at times emitted, especially when fresh coal is put on, which volumes continue about five minutes after each addition of fresh coal; the number of furnaces, and the frequent additions, make the emission of smoke almost incessant.   The smoke and soot are carried to, over and into the dwelling and factory of the plaintiff; if the door and windows are open, the soot sometimes settles on the furniture of the house, and on the machinery and goods in the factory.   It is only when the wind blows from a particular point, and when the atmosphere is in a particular state, that smoke and soot are carried to the plaintiff's buildings.   They are annoying to the occupants of the plaintiff's house and the operatives of his factory, and, to a slight extent, injurious to those buildings.   There was no evidence of any injury to the goods manufactured, or to the health of the family or operatives.   The furnace-stacks are as high as such stacks are ordinarily built—a material increase of their height would involve enormous expenditure, would destroy their usefulness, and " is therefore wholly impracticable."   Bituminous or semi-bituminous

coal is of great value in manufacturing bar-iron, car-axles and cannon, to which strength and toughness are essential, and no process has been discovered by which first quality iron can be made in considerable quantities without this coal: to prohibit the use of it to the defendants would be equivalent to a total suspension of their business.

" In the opinion of the master the respondents are not guilty of maintaining a nuisance of any sort whatever. They are guilty of no public or private injury, and of no wrong of any kind calling for any interference with their privileges by a court of equity or otherwise." He therefore reported that the bill be dismissed at the costs of the plaintiff.

On exceptions to the master's report, it was sustained by the Court of Common Pleas, and the bill dismissed at the cost of the plaintiff.

The plaintiff appealed, and assigned for error the dismissal of his bill with costs.

*W. Darlington* and *Meredith* (with whom was *W. Meredith*), for appellants.—The defendants had no right to corrupt the air; it is like corrupting a stream: Howell *v.* McCoy, 3 Rawle 269; Aldred's Case, 9 Rep. 58; Morley *v.* Pragnell, Cro. Car. 510; Rex *v.* White, 1 Burr. 333; Rex *v.* Neill, 2 Carr. & Payne 485; 3 Bl. Com. 217; 2 Show. 327; Walter *v.* Selfe, 4 De Gex & Sm. 315; Pollock *v.* Lester, 11 Hare 266; Soltau *v.* De Held, 2 Sim. N. S. 3, 133; Crump *v.* Lambert, 2 Pitts. Leg. J. N. S. No. 43, Aug. 5th 1867; Galbraith *v.* Oliver, Id. No. 48, Sept. 9th 1867; Hole *v.* Barlow, 4 Com. Bench N. S. 334; Bamford *v.* Turley, 9 Jur. N. S. 377; Jones *v.* Powell, Palm. 539; Gale on Easements 410; Hawk. P. C. b. 1, c. 75, § 10; St. Helen's Smelting Company *v.* Tipping, 5 Am. Law Reg. N. S. 104.

If the defendants have created a *public* nuisance, no time can save it: Commonwealth *v.* Alburger, 1 Wh. 469. If a private nuisance without a grant (which is not pretended), they must prove prescription: Hoy *v.* Sterrett, 2 Watts 330; Dyer *v.* Depui, 5 Wh. 597; Bliss *v.* Hall, 4 Bing. N. C. 183; Roswell *v.* Prior, 12 Mod. 638; Luttrel's Case, 4 Rep. 87; Flight *v.* Thomas, 10 Ad. & El. 590; Commonwealth *v.* Van Syckle, Brightly 69.

To allow the emission of this smoke because to stop the use of bituminous coal would be equivalent to suspending the defendants' works, would be to legalize a nuisance for reasons of public policy; this can be done by the legislature only: Wheatley *v.* Chrisman, 12 Harris 202; Resp. *v.* Caldwell, 1 Dall. 150; Pottstown Gas Co. *v.* Murphy, 3 Wright 257; Attorney-General *v.* Birmingham, 4 Kay & Johns. 528; Spokes *v.* Banbury Board of Health, 1 Law Rep. Eq. Cas. 42; Goldsmid *v.* Tunbridge Wells, Id. 161; London Quart. Rev. April 1866.

[Richards's Appeal.]

A custom cannot be set up in justification of a nuisance. Customs are not allowed to set aside principles of law: Henry *v.* Risk, 1 Dall. 265; Stoever *v.* Whitman, 6 Binn. 417; Bolton *v.* Colder, 1 Watts 360; Rapp *v.* Palmer, 3 Id. 179; Coxe *v.* Heisley, 7 Harris 243; Commonwealth *v.* Passmore, 1 S. & R. 217; Vaughan *v.* Holdes, Cro. Jac. 80.

The expense which the defendants have incurred in erecting their stacks, and what it would cost to abate the nuisance, cannot be considered: Commonwealth *v.* Erie and N. E. Railroad, 3 Casey 376.

The great advantages arising from the works will not justify the nuisance: Farmers of Hampstead Water, 12 Mod. 519.

They cited also Hughes *v.* Heiser, 1 Binn. 463; Pittsburg *v.* Scott, 1 Barr 319; Dennis *v.* Eckardt, 3 Gr. 390; Scheetz's Appeal, 11 Casey 88; Bullen *v.* Michel, 2 Price 399; O'Connor *v.* Cook, 8 Ves. 536; McCallum *v.* Germantown Water Co., 4 P. F. Smith 40.

*W. McVeagh* and *R. C. McMurtrie*, for appellees.—The remedy is not of right, but discretionary: Bedford *v.* British Museum, 2 My. & Keen 562; Sanders *v.* Smith, 3 My. & Cr. 711, 728; Ripon *v.* Herbert, 3 My. & Keen 119; Attorney-General *v.* Nichol, 16 Ves. 342; Hilton *v.* Grenville, Cr. & Ph. 292; Robeson *v.* Pittenger, 1 Green. Ch. 64; Winfield *v.* Crenshaw, 4 Hen. & Munf. 474; Rorer *v.* Randolph, 7 Porter 247–8; Dana *v.* Valentine, 5 Met. 8; Eason *v.* Perkins, 2 Dev. Eq. 40–1; Barnes *v.* Calhoun, 2 Iredell Ch. 201; Bradshaw *v.* Lea, 3 Id. Ch. 305, s. p.; Roberts *v.* Anderson, 3 J. C. R. 202; Smith *v.* Adams, 6 Paige Ch. 435; Hamilton *v.* Railroad, 9 Id. 171; Van Bergen *v.* Van Bergen, 3 Johns. Ch. Rep. 287.

In the exercise of their discretion the court will take all the circumstances into consideration: Fishmongers *v.* E. I. Co., 1 Dick. 163–5; Hilton *v.* Grenville, Cr. & Phil. 297; Ripon *v.* Herbert, 3 My. & Keen 169; Attorney-General *v.* Nichol, 16 Ves. 342; Squire *v.* Campbell, 1 M. & Cr. 459; Rover *v.* Randolph, 7 Porter 247–8; Dana *v.* Valentine, 5 Met. 8; Eason *v.* Perkins, 2 Dev. Eq. 40–1; Barnes *v.* Calhoun, 2 Iredell Ch. 201; Bradshaw *v.* Lea, 3 Id. 305.

Unless the plaintiff can establish by a verdict that the defendants' trade is a nuisance, equity will not restrain them: Fishmonger's Co. *v.* E. I. Co., 1 Dick. 163–5; Squire *v.* Campbell, 1 M. & Cr. 459; Crowder *v.* Tinkler, 19 Ves. 622; Attorney-General *v.* Cleaver, 18 Ves. 211, 17, 20.

The opinion of the court was delivered, February 3d 1868, by

THOMPSON, C. J.—The complainant in this case is the owner of a dwelling-house and cotton factory in the village of Phœnix-

ville, Chester county; and the respondents are owners of very extensive iron works in the same village. The former complains that by reason of the kind of fuel used by the latter in their works, his residence is rendered uncomfortable and unwholesome, and his factory materially injured in the discoloration of his fabrics and deterioration of his machinery. Claiming that he had established this, he asked the court below for a perpetual injunction to restrain the respondents from using the fuel, bituminous and semi-bituminous coal complained of as the cause of the injury to his property in these furnaces. The case was heard on bill and answer, and the court decided against him. He was then permitted to file a replication and take testimony, on which there is a report of a master also against him. The court having sustained the report, again refused to enjoin the defendants, and the case is before us on an appeal, and we are asked to do what the court below refused, namely, perpetually to restrain the defendants from using bituminous or semi-bituminous coal in their furnaces.

The defendants' works are very extensive, amongst the most so, it is said, of any of the kind in the Commonwealth, consisting of several blast furnaces, some seventy puddling furnaces, and rolling-mills and other machinery. They began on a small scale some forty-nine or fifty years ago, and up to 1840 used bituminous coal exclusively. The original works were not precisely on the spot of those complained of, but so near it as to entitle the latter to be regarded as an extension of the former. The extensions made in the works in 1837, 1846 and 1853, constitute the present works, the cost of which alone is represented as exceeding half a million of dollars, and which at the time of taking the testimony, and previously, employed, as the master reports, from eight hundred to one thousand hands.

The plaintiff's dwelling, it appears, is situated on a bluff or hill northwardly from the defendants' works, about seventy feet above the nearest furnace floor, which brings its first story about on a level with the top of the puddling-stacks, and when the wind is towards the plaintiff's house and from the furnace, the consequence is, that it is at times enveloped in a coal-smoke thrown out of the chimneys of the puddling furnaces. It cannot be doubted, I think, that this materially operates to injure the dwelling-house as a dwelling, and consequently to deteriorate its value. The alleged injury to the factory is mainly that the smoke and soot of the furnace blackens the stock and renders the fabrics less saleable. This I can readily understand and believe. The house was erected in 1829, and the factory in 1834, and both have been generally occupied ever since; the factory not doing full work for some time past, as the master reports.

A careful consideration of the testimony satisfies us that the use of semi-bituminous coal, the fuel complained of, is necessary

to the successful manufacture of iron fit for axles, cannon and the like, in the manufacture of which the defendants are largely engaged; that the process of manufacture, and fuel used, are gen-erally employed in similar establishments, and that there was neither a negligent nor wilful infliction of injury upon the plain-tiff or his property in the defendants' mode of operating their works. Whatever of injury may have, or shall result to, his pro-perty from the defendants' works, by reason of the nuisance com-plained of, is such only as is incident to a lawful business-conducted in the ordinary way, and by no unusual means. Still there may be injury to the plaintiff; but this of itself may not entitle him to the remedy he seeks. It may not, if ever so clearly estab-lished, be a case in which equity ought to enjoin the defendants in the use of a material necessary to the successful production of an article of such prime necessity as good iron; especially if it be very certain that a greater injury would ensue by enjoining than would result from a refusal to enjoin. If we were able with certainty to say that the use of semi-bituminous coal, in the pro-cess of making good iron by the puddling process, was unneces-sary, and other fuel was equally good and available, or that by a reasonable expenditure of money on the works, all injury might be avoided, a different case might appear to our minds as chancel-lors, and we might then say that the cause of injury should cease, and that a decree in terms to meet such a contingency should be made so as to prevent the injury. But we have not such case be-fore us. Bituminous, or at least semi-bituminous coal, we think, from the testimony, is necessary in the manufacture of iron, such as the business of the defendants require, and whose fabrics the public require. Nor are we shown by testimony or reliable tests of any kind, that the smoke produced in the puddling process can be consumed, as it undoubtedly may be in ordinary chimneys, or when produced in furnaces used to propel machinery. I am per-sonally cognisant that this may be done, from observation both in this country and in England; and I have therefore read with satis-faction and entire conviction of the truth, the article from the London Quarterly of 1866, so largely quoted by the learned counsel for the appellants; but I would be very unwilling to act on that conviction or that theory any further than to the extent to which experiment has gone. I would require very clear proof of the practicability of the application of the principle to uses dissimilar, or partially so, as puddling chimneys from common fur-nace smoke-stacks. The defendants seem willing to test the appli-cability of smoke consumers to puddling furnaces, and at the same time express their doubts in a practical shape by offering $50,000 for an invention which will consume the smoke of their puddling stacks without impairing the efficiency of the process of manu-facturing iron. However this may be, certain it is, we are not

able to say from anything shown, that the evil complained of can be remedied by the application of smoke consumers. We do not know what effect their application might have on the process; nor do we think we should visit the defendants, because they might be unwilling to add to the height of their chimneys without knowing what effect it would have, or because they might not be willing to tear down their establishment and re-erect it on Seiman's plan or patent. What effect these remedies, or either of them, ought to have on the mind of a chancellor, if feasible, and the injury complained of were absolutely irreparable, we are not called upon to say, for such is evidently not the case here if there be any damage at all, as we shall presently show.

The rule on this subject is well stated in Grey *v.* The Ohio and Pennsylvania Railroad Co., 1 Grant 412, thus: "Where damages will compensate either the benefits derived or the loss suffered from a nuisance, equity will not interfere." See also Hilliard on Injunc. 271; Adams' Eq. 485; Fonblanque's Eq. 51; 2 Story's Eq. § 925, *et seq.*; Eden on Injunc. 269. In Coe *v.* Lake, 37 N. H. 254, it was said, where the bill prayed an injunction to suppress a nuisance to the plaintiff's land, it might be dismissed on general demurrer for want of equity, unless it appeared from the subject-matter affected by the alleged nuisance that there was danger of irreparable mischief, or of an injury such as could not be adequately compensated in a suit at law. These, and many other authorities to the same effect, some of which are on the paperbook of the appellees, prove conclusively that, as a general rule, mischief or damage is not irreparable which is susceptible of being compensated in damages. We have no doubt that an action at law will lie for an injury to property for causes similar to those mentioned in this bill, and if so, why will not the remedy be adequate in such case, and thus the injury be repaired in damages? We are not to presume that it will not be. This would be to impugn the justice of our common-law forms without a reason. We think, under the circumstances of the case, that the injunction ought to be refused, and the plaintiff left to his action at law for the recovery of such damages as he may have sustained or may sustain.

An error seems somewhat prevalent in portions, at least, of this Commonwealth, in regard to proceedings in equity to restrain the commission of nuisances. It seems to be supposed that, as at law, whenever a case is made out of wrongful acts on the one side and consequent injury on the other, a decree to restrain the act complained of, must as certainly follow, as a judgment would follow a verdict in a common-law court. This is a mistake. It is elementary law, that in equity a decree is never of right, as a judgment at law is, but of grace. Hence the chancellor will consider whether he would not do a greater injury by enjoining than would

7 P. F. Smith—8

[Richards's Appeal.]

result from refusing, and leaving the party to his redress at the hands of a court and jury. If in conscience the former should appear he will refuse to enjoin : Hiltio *v.* The Earl of Granville, 1 Craig & Ph. Ch. R. 292 ; Grey *v.* The Ohio and Penna. Railroad Co., *supra.* We think this is a safe rule, and that the case we are considering is within it. With these views, and on full consideration of all the testimony in the case, we are of opinion the injunction was properly refused in the court below, and that the decree dismissing the plaintiff's bill with costs must be affirmed.

Appeal dismissed at the cost of the appellant.