# Berkey v. Berwind-White Coal Mining Company, Appellants.

*Mines and mining—Surface support—Deed—Equity—Jurisdiction— Adequate remedy at law.*

Where a grantor has sold and conveyed all the coal underlying his land with the right to mine and remove the same without reserving surface support, and also without waiving such right of support as he may have at law, he has no standing to maintain a bill in equity for an injunction to restrain his grantee from mining and removing the coal in such a manner as may threaten to cause a subsidence or breaking of the surface, where it appears that the anticipated injury is not of an irreparable character, that no buildings or other permanent improvements would be endangered, that no overlaying strata of coal would be seriously and permanently disturbed or displaced, and that the coal in question was overlaid by a hilly surface of such thickness that subsidence was not probable. In such a case the surface owner has an adequate remedy at law in damages.

To entitle a plaintiff to an injunction he must make out a plain case of injury and damage. If the injury be doubtful, eventual or contingent, equity will not interfere by injunction. A chancellor will consider whether he would not do greater injury by enjoining than would result from refusing and leaving the party to his redress at the hands of a court and jury.

Mr. Justice Mestrezat, dissents.

Argued Oct. 19, 1907. Appeal, No. 176, Oct. T., 1907, by defendants, from decree of C. P. Somerset Co., Equity Docket, 1906, No. 4, on bill in equity in case of Henry Berkey v. The Berwind-White Coal Mining Company and The Wilmore Coal Company. Before Mitchell, C. J., Fell, Brown, Mestrezat, Potter, Elkin and Stewart, JJ. Reversed.

Bill in equity for an injunction.

KOOSER, P. J., filed an opinion in which he found the facts to be as follows:

1. On the hearing, November 15, 1906, on motion of its solicitors filed, the Wilmore Coal Company was permitted to intervene as defendant.

2. Prior to November 30, 1892 (and from 1884), the plaintiff was the owner in fee of the entirety of a certain farm in Paint township, Somerset county, Pennsylvania, adjoining lands of Jacob A. Weaver, Peter Hoffman, David Shaffer's heirs, John Jones, Josiah Blough and Alfred Gaghagen, containing 119 acres and 133 perches, and on November 30, 1892, he conveyed to Robert H. Sayre all the coal and minerals in and underlying the said farm, excepting the limestone, describing the farm by metes and bounds, and with the following rights and privileges: " Together with the free and uninterrupted right of way into and through said lands, and to build, keep and maintain roads and ways in and through said mines forever for the transportation of said coal, etc., and of coal and other things necessary for mining purposes from and to other lands, with the right to mine and carry away all of said coal and minerals, and with all the mining rights and privileges necessary or convenient to such mining and removal of same, or by reason of the manufacture of the said coal into coke or other products at such places as may be selected by said second party, his heirs or assigns. Said second party agrees to pay for any such surface used for mining, etc., the general price for such land."

On June 12, 1895, Robert H. Sayre et al. conveyed said coal and minerals to the Wilmore Coal Company, with the mining rights and privileges above stated.

The plaintiff is yet the owner of the surface soil and the limestone he reserved.

3. The Berwind-White Coal Mining Company, a corporation organized under the laws of Pennsylvania, is the lessee under the Wilmore Coal Company, of the said coal. It commenced the mining and removal of the coal in said " Bed B " or " Miller seam " under plaintiff's farm in the spring of 1902, and has been mining practically continually therein since. It has already mined, and before the granting of the preliminary injunction in this case had mined all the coal, and re-

moved the pillars and supports from somewhat more than one-half of said farm, and under the remainder of the farm (and also before the preliminary injunction was granted) headings had been driven and rooms cut off, and the coal removed therefrom, but the pillars and ribs were left standing and have not yet been removed.

The mining operations under this farm have been conducted by drifts or slopes through the same seam on adjoining lands, and from openings or mine mouths at a remote distance from plaintiff's farm.

4. The thickness of the covering over the " B " seam on this Berkey farm is variable, ranging from ninety-seven feet, the thinnest cover in the northeast, along the Gaghagen line, to 202 feet at or near the dwelling house and to 279 feet in the south part (the average being about 150 feet). The " Limestone " or " D " seam lies from 130 to 135 feet above the " B," and the " D " seam " C prime " and " C " seams overlie the " B " over the greater part of the farm. Ordinarily bed " D " overlies immediately a bed of limestone of about two feet in thickness, but I am unable to find from the evidence that it so lies on this farm or in this neighborhood. The plaintiff prospected for this limestone, but failed to find it, and says he knows of none opened on farms near this one. Plaintiff's witness Fetterman says limestone sometimes underlies " B " seam and sometimes does not. The seams above " B " are owned by the Wilmore Coal Company under same conveyance as " B " from plaintiff, and interference with the covering over " B " causing cracks and depressions in the surface, would interfere with the coal strata above " B," with like effect as with the stratum of limestone above, if there be limestone there.

5. The rooms of the headings are mined to a width averaging from thirty to thirty-five feet, and about 400 feet in length, and the pillars left standing are thirty-three feet thick. The headings are sixteen feet wide, with a parallel back-heading or air-course fourteen to fifteen feet wide, with a pillar or wall of coal between them; through this pillar or wall between the heading and the air-course, crosscuts are made at intervals, and these closed with brattice boards as the mining progresses.

6. There were on this farm ten or eleven springs of water of varying strength, but all constant, three or four of them strong, the one at or near the dwelling house being one of the strong springs, and they all ceased flowing in the summer and fall of 1904 and as early·as September 15. Since then none of them has been constant. During wet seasons, for several months in each year, they supply sufficient water for the use of the farm, but are useless during the rest of the year.

The loss of the springs has depreciated the value of this farm greatly. The loss of water from the springs constitutes the principal item of damages suffered by the plaintiff by reason of the mining operations of the defendant. Any injury to the springs by mining operations of defendant was done before the preliminary injunction in this case was granted.

7. At eight or nine different places upon the eastern side of the farm from under which the coal was first mined and the pillars drawn the surface has subsided, leaving depressions of varying sizes of from about 500 feet by 300 feet to about 157 feet by 97 feet, and varying in depth at about their middle (to which they slope gradually) from one to two and a half feet. There were also several cracks at the surface, about the edges of some of these depressions, from 100 to 300 feet long, and in their widest place, about four inches. These depressions and cracks were first observed in the spring or summer of 1905, and two of the smaller depressions have appeared since the preliminary injunction was granted. These depressions have substantially depreciated the value of the farm—perhaps to the amount of several thousand dollars—but this depreciation is much less than (not one-fourth as much as) that caused by loss of water in the springs.

8. In the sale and conveyance of the coal and minerals the plaintiff did not release damages that might result to the surface from the mining and removal of the coal and minerals, and neither the owner nor the lessee of the same claims there was such release.

9. Of the lands surrounding plaintiff's farm those to the south and southwest (Hoffman and part of Shaffer) lie higher, and the others lower than plaintiff's farm. The mining had been done under these adjacent farms, and under the plaintiff's farm before the springs failed—the mining under plain-

tiff's farm being as heretofore stated, the removal of pillars from under the eastern half (approximately) and the cutting of headings and rooms under the remainder.

10. The plaintiff's farm, not including the coal and minerals sold, was worth about $100 per acre, before the springs were affected as found, and before the appearance of the depressions and cracks as found heretofore.

11. No mining has been done by defendant under the house or the barn of plaintiff. Rooms have been driven to block of coal left under them, but how closely I cannot say from the evidence, but from the map, perhaps twenty-five feet from opposite corners of the barn, and perhaps thirty feet from the one corner of the house. Since the mining operations on the east side of the farm, a narrow vertical crack has appeared in the wall of the house.

12. If the defendant company draw the pillars now standing under the western half of the farm, as before the date of the issuing of the injunction they did under the eastern half, it will not affect the springs further, but will cause other depressions and cracks upon plaintiff's farm which will be permanent and irreparable damage. The cover over the western half being, in the main, heavier than that over the eastern half, the depressions would be less, and the damage less than that sustained on the eastern half.

These depressions occur not all at one time, but at intervals, and may continue to appear over a long period.

13. The Wilmore Coal Company, one of the defendants, is to receive from the Berwind-White Coal Mining Company, the other defendant, a royalty of ten cents per ton, for all the coal mined on said premises, and the leaving of said ribs or pillars of coal which yet remain in place on said premises would result in a yield of less royalty to the said Wilmore Coal Company by at least $18,000 than if these ribs and pillars were mined and removed; and the net profits to the Berwind-White Coal Mining Company, by reason of its extensive improvements, machinery, appliances and equipment for mining coal, would be at least $18,000 more if it should mine and carry away the ribs and pillars yet standing in said mine, under plaintiff's farm, as was done under the eastern part of said farm, leaving no support for the surface, than its profits

will be if the ribs and pillars yet standing shall remain in place.

Each of these sums is several times as large as any amount of damage which the plaintiff claims has resulted, or would or might result, from the removal of the said pillars.

14. Most of the springs on plaintiff's farm were located near the lines of the farm, but at least three were well within the body of the farm, and one of the strongest and most valuable was near plaintiff's dwelling house. As early as September 15, 1904, all the springs on the farm had failed as constant, and plaintiff has had to haul water much of the time since.

15. The thickness of the "B" seam is from three feet ten inches to four feet. The evidence establishes that if all the ribs and pillars of coal yet remaining on the premises were removed, the injury to the surface and to the seams of coal, and the seam of limestone if there be such seam, above the "B" or "Miller" seam by any subsidence caused thereby would be more regular and widespread, and the injury to the surface less than if the ribs and pillars were left standing, and many subsidences should occur between the standing ribs. Subsidences, whether at places where ribs have been drawn, or where they are permitted to remain, are an injury and damage to the surface. The thinner the seam mined and the heavier the cover, the less is the disturbance from subsidence, and the less the depression in the surface when they occur. From the cover over the "B" seam in the part of plaintiff's farm on which the pillars yet stand, I am unable to find that material depressions must appear if the ribs are allowed to stand, or if any, to even conjecture their probable number or proportion.

16. On April 3, 1906, the plaintiff filed a bill in equity to No. 4, Equity Docket, 1906, and obtained from this court a preliminary injunction, restraining the defendant from removing the pillars of coal which had been left standing on said mining operations, the plaintiff alleging in said bill that by the removal of said pillars the surface would be broken and irreparable damage done to said farm, and the springs of water destroyed and other damages done, and that the plaintiff was without adequate remedy at law. This preliminary injunction was obtained without notice to the defendants.

17. On April 27, 1906, the defendants filed an answer, and on November 14 and 15, 1906, the court heard testimony on the motion to dissolve the preliminary injunction. At the time of the hearing leave was granted to the Wilmore Coal Company to intervene as defendant; and it was agreed by the solicitors for all the parties that the hearing then had should be final and the case disposed of as upon final hearing.

The court entered the following decree:

And now, January 14, 1907, this cause came on to be heard at this time, and was argued by counsel, and upon consideration thereof it is ordered, adjudged and decreed as follows, viz.: That the defendants, their agents, employees, servants and other persons do henceforth perpetually desist from mining and removing, causing to be or permitting to be mined and removed the coal yet remaining in place as pillars under so much of the plaintiff's farm described in the bill filed in this case, as such pillars yet remain as aforesaid, in any manner that will cause subsidence or breaking of the surface of plaintiff's land, or that will result in damages present or future to the surface; conditioned, however, that the coal in said pillars may be mined and removed if immediately upon the removal of any pillars or parts of pillars, the removal of which will endanger subsidence of or injury to the surface, sufficient support of stone or other permanent material be substituted to furnish complete support to the surface against subsidence and injury; that so much of the preliminary injunction as relates to the displacement of a limestone stratum, and as required defendants to provide permanent support to the surface where they had endangered or rendered insecure the surface by mining operations at the time the preliminary injunction was granted is dissolved. Defendants to pay the costs of this proceeding.

*Error assigned* was in granting a permanent injunction.

*W. H. Ruppel* and *David L. Krebs*, with them *C. F. Uhl, Jr.*, for appellants.—The case must be determined upon the facts as they existed at the time of the filing of the bill: New Boston Coal & Mining Co. v. Water Co., 54 Pa. 164; Coal Co.'s App., 54 Pa. 183; McDonough v. Bullock, 2 Pearson, 191.

Mere anticipation of damage or injury in the future is not sufficient to warrant the court in granting an injunction ; the plaintiff must make out a case which clearly established danger and not mere apprehension of damages : Shaw v. Transit Co., 4 Pa. C. C. Rep. 363 ; Lehigh, etc., Coal Company v. Canal Co., 11 Pa. C. C. Rep. 185.

It is a well-settled principle that where injury can be redressed in an action at law equity will not interfere : Grey v. Railroad Co., 1 Grant, 412 ; Mulvany v. Kennedy, 26 Pa. 44 ; New Boston Coal, etc., Co. v. Water Co., 54 Pa. 164 ; Richards's Appeal, 57 Pa. 105 ; Rhodes v. Dunbar, 57 Pa. 274 ; Ramsey's Appeal, 88 Pa. 60 ; Berks, etc., Turnpike Road v. Lebanon Steam Co., 5 Pa. C. C. Rep. 354 ; Gummere v. Railroad Co., 12 Pa. C. C. Rep. 106 ; Georges Creek Coal Co. v. Detmold, 1 Md. Ch. Dec. 371 ; Spotts v. Farling, 2 Pearson, 295.

No rule has become more thoroughly imbedded in our equity practice, and probably none is laden with more beneficial effects than that which causes the court to withhold an injunction where the granting of it would be of greater damage to the defendant then such refusal would be to the plaintiff : Richards's Appeal, 57 Pa. 105 ; Rhodes v. Dunbar, 57 Pa. 274 ; Huckenstine's Appeal, 70 Pa. 102 ; Mirkil v. Morgan, 134 Pa. 144 ; Chartiers Block Coal Co. v. Mellon, 152 Pa. 286, 287 ; Wahl v. Cemetery Association, 197 Pa. 197 ; McClelland v. Rush, 11 Pa. C. C. Rep. 188 ; Highspire Borough v. Transmission Co., 32 Pa. C. C. Rep. 91 ; Miles v. Penna. Coal Co., 214 Pa. 544 ; Cambria & Clearfield Railway Co. et al. v. Horn, 33 Pa. C. C. Rep. 545.

It was error to grant the injunction : Coleman v. Chadwick, 80 Pa. 81 ; Chartiers Block Coal Co. v. Mellon, 152 Pa. 286 ; Pringle v. Vesta Coal Co., 172 Pa. 438 ; Huckenstine's App., 70 Pa. 102 ; Scranton v. Phillips, 94 Pa. 15 ; Walters v. McElroy, 151 Pa. 549.

*Valentine Hay*, with him *J. E. Gasteiger, Alexander King* and *A. L. G. Hay*, for appellee.—The surface owner is entitled to absolute support from the mine owner, unless that right has been released, and this is so, even though the mine owner must leave every pound of coal in place to support the sur-

face : Jones v. Wagner, 66 Pa. 429 ; Coleman v. Chadwick, 80 Pa. 81 ; Horner v. Watson, 79 Pa. 242 ; Carlin v. Chapel, 101 Pa. 348 ; Williams v. Hay, 120 Pa. 485 ; Pringle v. Vesta Coal Co., 172 Pa. 438 ; Robertson v. Youghiogheny River Coal Co., 172 Pa. 566 ; Youghiogheny River Coal Co. v. Hopkins, 198 Pa. 343 ; Noonan v. Pardee, 200 Pa. 474 ; Youghiogheny River Coal Co. v. Allegheny Nat. Bank, 211 Pa. 319 ; Weaver v. Berwind-White Coal Company, 216 Pa. 195 ; Miles v. Pennsylvania Coal Co., 217 Pa. 449.

The rule of comparative value is not applicable to the case in hand, under the best authorities : Evans v. Fertilizing Co., 160 Pa. 209 ; Higgins v. Water Co., 36 N. J. Eq. 538 ; Sheaffer's App., 100 Pa. 379 ; Sullivan v. Steel Co., 208 Pa. 540 ; Waters v. McElroy, 151 Pa. 549 ; Bigler v. Penna. Canal Co., 177 Pa. 28 ; Penna. Lead Co.'s App., 96 Pa. 116 ; Price v. Grantz, 118 Pa. 402.

The court has never held words to amount to a waiver of surface support unless they are couched in such apt, plain and unmistakable language, that their import could not be questioned : Chartiers Block Coal Co. v. Mellon, 152 Pa. 286.

*W. H. Ruppel* and *David L. Krebs*, with them *C. F. Uhl, J.*, for appellants, in reply.—There is no irreparable damage : Com. v. P. & C. R. R. Co., 24 Pa. 159, 160 ; Johnson v. Kier, 3 Pittsb. Rep., 204–210 ; Phila. Ball Club v. Lajoie, 202 Pa. 210 ; Wilson v. City of Mineral Point, 39 Wis. 160, 164 ; Hodge v. Giese, 43 N. J. Eq. 342 ; Missouri, etc., Railway Co. v. Texas, etc., Railway Co., 10 Fed. Repr. 497, 503.

OPINION BY MR. JUSTICE ELKIN, January 13, 1908 :

The bill filed in this case asks for an injunction to restrain the appellants from mining and removing the coal underlying a certain tract of land therein described in such a manner as will do damage, present or future, to the surface by causing a subsidence or breaking thereof.   The learned court below, sitting as a chancellor, on the filing of the bill, granted a preliminary injunction, which, after hearing, was made permanent. The real question involved in this case is one of remedy rather than of legal right.   The controversy grows out of the assertion of the right upon the part of the grantor, who had sold

and conveyed all the coal underlying the land in question, to restrain his grantee and its lessee, the appellant companies, from mining and removing the coal in such a manner as to do injury to the surface. The right to surface support was not expressly waived in the deed of conveyance, and, therefore, the owner of the surface is entitled to the benefit of the rule which imposes upon the underlying or mineral estate the servitude of sufficient support to the upper or superincumbent strata: Weaver v. Coal Company, 216 Pa. 195. This is the settled rule of law in Pennsylvania, and nothing said or decided in the present case is intended to weaken or modify it. Each party to this proceeding stands upon certain legal rights and the principal inquiry must be whether the appellee, under the facts produced at the hearing in the court below, is in a position to ask a court of equity to interfere by injunction. No general and unbending rule can be laid down in such cases. Much depends upon the facts of each particular case. Of course, if the injury complained of is irreparable so that it cannot be adequately compensated in damages, or if the act intended to be committed is in the nature of a trespass, or tort, or if the wrong sought to be redressed amounts to a nuisance, which by reason of the persistency with which it is repeated, threatens to become permanent, courts of equity will interfere by injunction to prevent such wrongs: Commonwealth v. Railroad Company, 24 Pa. 159; Stewart's Appeal, 56 Pa. 413; Allison's Appeal, 77 Pa. 221; Bitting's Appeal, 105 Pa. 517; Walters v. McElroy, 151 Pa. 549. The present case does not come within the reason or spirit of the rule announced in these cases. Under the facts of the case at bar it cannot be successfully contended that the injury is irreparable, at least in the sense that it cannot be adequately compensated in damages and certainly the mining and removing of coal by the party who owns it and has the right to remove it, and whose operations are conducted by the most approved methods known in mining operations, cannot be said to be a trespass, or tort, or nuisance, within the meaning of the rule of the above cited cases in which equitable relief has been granted. In the above cases the respondents were trespassers without any right of property in the thing injured, while in the present case appellants are the owners or lessees of the coal with the right to

remove it.   It may be that under the rule of our Pennsylvania
cases the doctrine of the balancing of equities or of comparative
values, should have no controlling weight in the determination
of the rights of the parties to this proceeding.     It must be con-
ceded that this doctrine has not been favored in our state, al-
though it is recognized in other jurisdictions and supported by
text-writers very generally.   Our courts look more to the exact
legal rights of the parties than to the equities that may exist be-
tween them, even when these questions are raised in a proceed-
ing in equity.   We do not understand, however, that it has ever
been held that the doctrine has no application at all, but rather
that such considerations will not prevail against the legal rights
of the parties when definitely ascertained.   It is difficult, if not
impossible, to lay down any rule relating to proceedings in eq-
uity, or to state general principles applicable thereto, which
should be held to operate conclusively on the mind of a chancel-
lor under the facts of a particular case.   The decree of a chancel-
lor is of grace not of right, and he is not bound to make a decree
which will do more mischief and work greater injury than the
wrong which he is asked to redress : Coal Company v. Mellon,
152 Pa. 286.   Each bill filed is a prayer to the conscience of a
chancellor.   The whole system of equity jurisprudence is
founded on the theory that the law, by reason of its universality,
is unable to do justice between the parties, and that equity, not
being bound by common-law forms and pleadings, has more
elasticity and can better reach this end.   It seems like doing
violence to the whole system to ask a court of equity to do an
inequitable thing.   In every case, to some extent at least, a
chancellor must take into consideration the equities existing
between the parties.   In our state we have never departed
from the settled rule that equity will not interfere when there
is an adequate remedy at law.   It is often difficult to deter-
mine whether the remedy at law is adequate, and in passing
upon this question equity jurisdiction has been extended from
time to time by our courts.   A court of equity in passing upon
the question whether the remedy at law is adequate, should
have due regard to the situation of the parties.   The case at
bar is an illustration.   The appellee sold and conveyed all of
his coal to one of the appellants, which leased it to the other,
and has been paid the consideration in full.   By his express

covenant the mining company is given the right to mine and remove all the coal, so that when in the prosecution of its mining operations it undertakes to mine and remove the entire stratum it is only doing what the appellee in the express language of his covenant said could be done. A rule of law, as old as the commonwealth, comes to his aid by charging upon the underlying mineral estate the servitude of surface support, in the absence of the waiver of this right in the grant. The law has thus done for him what he has not done for himself. Of course, he is entitled to have his rights protected, no matter how they arise, but his vendee and its lessee, the appellants here, on the other hand, must also be protected in the enjoyment of the rights acquired under the deed of conveyance. This was the situation of the parties at the time of the filing of the present bill. The appellants had the title to all the coal, with the right to mine and remove it. The appellee, under the rule of law, above referred to, had no title to the coal or any part of it, but only the right to have his surface sufficiently supported. In a sense both parties are standing upon their legal rights. It was not for appellee to say how much coal should be mined and removed, because the coal did not belong to him. He can insist upon his right to have the surface reasonably supported and if this is not done and injury results by failure in this respect, he can recover damages to the full extent of the injury done. None of our cases have gone further than this up to the present time. We are now asked to take a step in advance by recognizing the right of the owner of the surface to proceed in a court of equity to restrain the owner of the coal from mining and removing it in such a manner as may cause subsidence or breaking of the surface. In other words, the court is asked to restrain a mining company from mining its own coal because it may reasonably be anticipated that the removing of the coal will cause a subsidence or breaking in the surface. Such a remedy would be a proper one if the facts of a particular case warranted such intervention. If the threatened injury is of an irreparable character which could not be compensated in damages by an action at law ; or if buildings or other permanent improvements would be endangered; or if overlying strata of coal, or other mineral estate, would be seriously and

permanently disturbed or displaced, by the mining of all the coal, it is clear equity would in proper case intervene to restrain such acts, even before the injury had been done. But none of these conditions are shown to exist in the present case. The coal has already been mined from the lower and more level parts of the tract and the coal yet to be mined is overlaid with a hilly surface furnishing a covering from 200 to 250 feet thick. The vein of coal varies from three feet six inches to four feet in thickness, and the evidence produced at the hearing, as well as the experience of all those familiar with mining operations, shows that very little, if any, damage will be done that part of the surface by mining and removing the coal. The loss of springs of water is principally relied on by complainant to show damage to his surface, but the evidence is not sufficient, in our opinion, to establish the fact that the springs were affected by failure to furnish surface support. Springs of water are frequently affected by the mining of coal even when the surface is properly supported, and under the facts of the present case the weight of the evidence would seem to show that failure to provide surface support was not the cause of the springs drying up. As to the buildings, the evidence is clear that the coal has not been mined from under the same, and, therefore, it cannot be said that any damage has been done to them from this cause. If at any time the appellants should undertake to mine the coal from under the buildings, or other permanent improvements on the tract, the owner could prevent the same by injunction. The appellants deny that they have mined the coal from under the buildings and aver that it is not their intention to do so, and under these facts a case for equitable relief is not made out in this respect. The evidence fails to disclose any threatened injuries of the character above indicated, and in our opinion the rights of the parties can be fully protected by an action at law. As was said in Pringle v. Vesta Coal Company, 172 Pa. 438: "If the owner of the coal undertakes to mine and remove it, as he has an undoubted right to do, and damage results to the surface, either (a) from negligence in conducting his mining operations, or, (b) from failure to properly and sufficiently support the surface, or (c) from both these causes combined, the surface owner is entitled to recover compensation for such injury as

he may show he has sustained." To entitle a plaintiff to an injunction he must make out a plain case of injury and damage. If the injury be doubtful, eventual or contingent, equity will not interfere by injunction: Rhodes v. Dunbar, 57 Pa. 274. A chancellor will consider whether he would not do greater injury by enjoining than would result from refusing and leaving the party to his redress at the hands of a court and jury: Richards's Appeal, 57 Pa. 105; Huckenstine's Appeal, 70 Pa. 102. The present case certainly comes within the spirit, if not within the express language, of the rule laid down in the cases just cited.

We, therefore, hold that for any damage done the surface in the past the complainant has his action at law; that as to the threatened injury to the surface in the future he has failed to establish such facts as would warrant a court of equity to interfere by injunction; and that, for injuries past, present and future so far as disclosed by the evidence in the present case he has a complete and adequate remedy at law to redress any wrongs that have been or may be done him.

Decree reversed and bill dismissed, all costs to be paid by appellants.


Mr. Justice Mestrezat, dissenting:

The conclusion of the majority of the court is not in accord with professional opinion in the bituminous coal district of the state. It substantially overrules the principle settled by all our cases that, unless otherwise stipulated by contract, the owner of the surface is entitled to absolute support from the owner of the underlying or mineral strata, even if the latter be required to leave in place the entire mineral estate. This principle is conceded in the majority opinion to be well established, but it is claimed that the question involved in the case is one of remedy rather than of legal right. This seems to me a most singular proposition, when the bill filed in this case by the plaintiff is to restrain the defendant company from mining and removing the coal underlying the plaintiff's surface, and thereby causing the surface to be destroyed, which, it is conceded, the defendant has no right, either at law or in equity, to do. It is not a question of one of two remedies; it is rather a question of whether the legal right of the plaintiff

to absolute support for his surface shall be enforced by the only court whose process can furnish a remedy entirely adequate to the injury which will follow the illegal acts of the defendant company. When a party's rights at law are admitted, or settled by an action, equity will always interfere to protect those rights, unless there is a complete legal remedy which is entirely adequate. And we have also distinctly held that the rule as to enjoining irreparable injuries only has no application to acts, especially corporate acts, entirely without authority, for which there is no adequate measure of damages at law: Groff's Appeal, 128 Pa. 621. Here, the legal right of the plaintiff to surface support is admitted, and if the defendant is permitted to mine and remove the coal without furnishing absolute support for the surface, the entire surface may be broken in such manner as to do irreparable injury or damage, and for which the law furnishes no adequate measure of damages. This makes a clear case for the intervention of a court of equity.

It is futile for this court, as it does, to hold that the plaintiff is entitled to absolute support of his surface, if the court is to deny him a full and complete remedy to enforce that right. It is a denial of the right for a chancellor to refuse to restrain the defendant from removing all the coal and permitting the surface to subside. It is not sufficient to say that if the defendant removes the coal and causes a subsidence of the surface, the plaintiff may bring an action at law for damages. The subsidence of the surface would result in the destruction of the plaintiff's crops and buildings, and practically deny him the use of his surface. The result would, therefore, be disastrous to the plaintiff, and the remedy at law would be wholly inadequate.

It is also well settled that equity will interfere by injunction to restrain trespasses constantly recurring, and which threaten to continue: Scheetz's Appeal, 35 Pa. 88; Stewart's Appeal, 56 Pa. 413; Keppel v. Lehigh Coal and Navigation Co., 200 Pa. 649. And in such cases it is no objection to the jurisdiction of a court of equity that the injured party may have a remedy at law: Walters v. McElroy, 151 Pa. 549. The principle of these cases clearly rules the case at bar against the appellant. As the mining progresses the surface will be

cracked and subside, and each day will result in one or more causes of action, until the coal has all been removed. The trespasses will, therefore, be constantly recurring, compelling the plaintiff, even if an action at law is adequate, to redress his injuries by a multiplicity of suits. It is apparent from these facts that equity is the proper remedy for redress of the plaintiff's injuries under the established practice of this state.

The difference in the value of the nine-foot vein of coal and the surface is so great that it will warrant the owner of the coal in removing the entire body of it at the risk of any action at law which the owner of the surface may institute against him. In some counties in the western part of the state, the bituminous coal region, the value of the surface is from $50.00 to $100 per acre, while the nine-foot vein of coal underlying the surface is worth $500 to $2,000 and upwards per acre. The owner of the coal, therefore, can well afford to remove the entire body of it if he is only required to respond for the injury done in an action at law. He can afford to remove his coal if it causes the destruction of the buildings, the waters, and the crops, if he is compelled to pay only such an amount as may be recoverable at law. I think it clear the uncontroverted facts show that such damages would be an entirely inadequate compensation for the injuries which are a necessary consequence of failing to properly support the surface. The removal of the coal being without the shadow of authority and an invasion of the conceded legal rights of the surface owner, it is in the face of all our decisions on the subject to say that a chancellor has no jurisdiction to entertain a bill to preserve the integrity of the plaintiff's surface.

The ruling in this case will injuriously affect not only the owner of the superincumbent surface, but also the owners of all veins of coal lying between the nine-foot or river vein and the surface. If the owner of the nine-foot vein may remove it, being liable only in an action at law for damages, he likewise is responsible only in an action at law to the owner of the five-foot or lesser vein of coal lying above the larger vein. The effect, therefore, of this decree is to withdraw from the owner of the smaller veins of coal the remedy by injunction to protect his conceded legal right to have his vein remain intact, unbroken, and in a condition that it may be safely oper-

ated. The only redress for such an invasion of the rights of the owner of the smaller vein is, under the ruling of this case, an action at law, the inadequacy of which is plainly apparent and is manifest upon a moment's reflection. In the bituminous coal region of the state there are frequently two and sometimes three veins of coal beneath the surface which are owned by as many different persons or corporations. Notwithstanding the conceded fact in this case that the owner of the nine-foot vein has no right whatever to injure or damage the upper strata of veins of coal, this court now holds that if such injury or damage does occur the only remedy is an action at law, although the effect of such injury may be a total deprivation of the owner of his vein of coal. The prevention of such results is clearly within equitable jurisdiction.

This case is manifestly one for equitable intervention, and in my judgment the court below was entirely right in its decree restraining the defendant company from removing the coal in such manner as would damage the plaintiff's surface.

Since writing the above my attention has been called to the recent case of de Saulles v. Percy Mining Company, 16 Pa. Dist. Rep. 684, decided in 1906 by the court of common pleas of the fourteenth judicial district. The question raised there is the identical question involved in this case, and the learned judge of that court after a very full and careful consideration of the question, citing numerous decisions and text-book authority in support of his conclusion, awarded an injunction restraining the owner of the coal from mining it without leaving proper support for the surface. The opinion in that case simply reflects the understanding of the profession in the bituminous coal region on the right of the surface owner to invoke the aid of a chancellor to compel the owner of the coal to furnish absolute support for the surface.

I would affirm the decree of the court below.