ST. LOUIS UNION TRUST CO. v. GALLOWAY COAL CO. et al.

(Circuit Court, N. D. Alabama, S. D. December 2, 1911.)

No. 207.

1. EVIDENCE (§ 157*)—SUIT FOR FORFEITURE OF COAL LEASE—ROYALTIES—EVIDENCE OF QUANTITY MINED.

In a suit by the lessor of coal mines against the lessee to enforce a forfeiture of the lease on the ground of underpayment of the royalties reserved, the tipple weights, made by a weigher for the lessee company and checked by one representing the miners, who as well as the lessor were paid on such weights, *held* to constitute the best evidence of the

quantity of coal mined and on which royalties were due in preference to estimates made by engineers from insufficient and inaccurate data, which also differed widely and were at best only approximations with liability to substantial error.

[Ed. Note.—For other cases, see Evidence, Dec. Dig. § 157.*]

2. MINES AND MINERALS (§ 70*)—FORFEITURE OF COAL LEASE—GROUNDS—INSUFFICIENT PAYMENT OF ROYALTIES.

A lessor is not entitled to enforce a declared forfeiture of a coal lease because of the payment of insufficient royalties, even if shown, where the lessee paid each installment in good faith in the belief that it was paid in full, and it was so accepted by the lessor, and where the lessee is solvent and willing to pay the amount of any shortage found by the court.

[Ed. Note.—For other cases, see Mines and Minerals, Dec. Dig. § 70.*]

3. MINES AND MINERALS (§ 64*)—CONSTRUCTION OF COAL LEASE—COVENANT AGAINST SUBLEASING—"ASSIGNMENT"—"SUBLEASE."

A covenant in a coal lease against assigning or subleasing without the consent of the lessor, when relied on as a ground of forfeiture, will be given a strict construction in equity, and a contract between such a lessee and a mining company, by which the latter was given possession of the lessee's plant and equipment and agreed to mine the property and load the coal in cars for the lessee, which retained the ownership and paid for the work, was merely a working contract, and not an "assignment" or "sublease" within the meaning of such a covenant.

[Ed. Note.—For other cases, see Mines and Minerals, Dec. Dig. § 64.*

For other definitions, see Words and Phrases, vol. 1, pp. 566–571; vol. 8, pp. 7584, 7807.]

4. MINES AND MINERALS (§ 62*)—CONSTRUCTION OF COAL LEASE.

Coal lands of complainant and another owner, which adjoined and could only be effectively mined together, were leased at the same time and through the same person acting for both lessors to defendant's predecessor in interest. The lease of complainant's land provided that the lessees might use the entries and passageways thereon for the purpose of mining "on any other lands which they may lease or buy, provided said lands are within 2,500 feet of the main slope opened on the land embraced in the lease." Held that, in view of the requirement of the leases and evident intention of the parties that all the land embraced in both leases should be mined, which could not be done without going more than 2,500 feet from the main slope of the mine, such provision must be construed as giving the lessees the right to use the narrow work on complainant's land to transport coal mined on any land, the nearest boundary of which was within that distance.

[Ed. Note.—For other cases, see Mines and Minerals, Dec. Dig. § 62.*]

5. MINES AND MINERALS (§ 66*)—COAL MINING LEASE—FORFEITURE.

Where defendant as lessee used the narrow work on complainant's land to transport coal mined from other land, for which no authority was given by the lease, but complainant suffered no substantial injury therefrom, such use is not ground for enforcing a forfeiture of the lease in equity nor for the granting of an injunction to restrain such use as a trespass, the effect of which would be to cause serious loss to defendant and to prevent the mining at all of certain of the land; but in such case complainant will be left to its remedy by the recovery of damages, unless such use should be extended beyond a reasonable time.

[Ed. Note.—For other cases, see Mines and Minerals, Dec. Dig. § 66.*]

6. MINES AND MINERALS (§ 68*)—COAL MINING LEASE—CONSTRUCTION.

Where adjoining coal lands of different owners, which could only be practically developed together, were leased together as a single transaction to the same lessees, the lease providing also that the lessees

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

should have the right to use the entries and narrow works for the transportation of coal mined on other lands they should acquire within 2,500 feet of the main slope of their mine, a provision of the leases requiring the "mines" to be worked continuously, with reasonable diligence, and for their best development, cannot be construed to require the lessee to work the mine for the best and most rapid development of the land of that particular lessor alone under penalty of a forfeiture of the lease, but as requiring the proper and symmetrical development of all the property, worked together as a single mine.

[Ed. Note.—For other cases, see Mines and Minerals, Dec. Dig. § 68.*]

7. MINES AND MINERALS (§ 68*)—COAL MINING LEASE—FORFEITURE—FAILURE TO PROPERLY DEVELOP.

A forfeiture of a coal mining lease for breach of a covenant to properly develop the property will not be enforced, where the lessee has acted in good faith, and the proper manner of development was largely a matter of judgment.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 188–191; Dec. Dig. § 68.*]

8. MINES AND MINERALS (§ 68*)—COAL MINING LEASE—CONSTRUCTION.

A lease, which demises and lets for a term of 20 years the right of "mining coal" on the land described, must be construed, in the absence of any reservation or limiting words, as giving the right to mine any coal under the leased land, and a further provision that in case a seam of coal, which was known and had been opened by prospecting, should fail or be worked out, the lessee might be released from payment of royalty, was one entirely for his benefit by giving him an option, but did not limit his right at his election to open other veins.

[Ed. Note.—For other cases, see Mines and Minerals, Dec. Dig. § 68.*]

In Equity. Suit by the St. Louis Union Trust Company, trustee, against the Galloway Coal Company and others. Decree for defendants on main issues.

Cabaniss & Bowie, for complainant.
Tillman, Bradley & Morrow, for defendants.

GRUBB, District Judge. This is a bill in equity, filed by the plaintiff as trustee for the owners and lessors, against the defendants, who were the original lessees, and their assignee and another, the purpose of which was to enforce the forfeiture of a mining lease because of certain alleged breaches of covenants contained therein. The defendants deny the breaches and ask to be relieved of any forfeiture because of them.

The alleged breaches, relied upon by the plaintiff, and which are supported by tendencies of the evidence, may be thus classified:

(1) Failure of the lessees or their assigns to pay the royalty reserved by the lease for two consecutive installment periods.

(2) The breach of the covenant against subletting or assignment.

(3) The breach of the covenant to mine coal in a proper and workmanlike manner at all points and in such a way as at no time to obstruct the advantageous working of the property or impair the availability or the value of the same in case of reversion to the owner.

(4) The breach of the stipulation that the lessees might use the slopes, headings, entry, or passageways to transport coal from other

lands, from which it had the right to mine, provided said lands were within 2,500 feet of the main slope.

(5) The breach of the covenant to work the mines continuously with reasonable diligence or for their best development.

Breaches of other covenants, relied upon, may be referred to one or the other of the foregoing.

The forfeiture clause is contained in the fifth paragraph of the lease, and is as follows:

"The said lessor shall have the right to terminate this lease after thirty (30) days written notice to the lessees, if royalty or rent be not paid for two (2) consecutive installments thereof when due, or if said lessees shall fail to work said mines continuously with reasonable diligence or for their best development, or if in any way any of the covenants of this contract be violated, or any injury, or damage be inflicted upon the property or interest of the lessor, other than unavoidably incident to the provisions herein contained, or for the purpose herein proposed."

The breaches will be considered in their order.

[1] I. Failure to pay royalty for two consecutive installment periods: The defendant the Galloway Coal Company, assignee of the lease, is conceded to have paid a certain amount of royalty at each installment period, when due, during the period of the lease, and up to the time of the forfeiture, and to have tendered what it claimed to be owing, thereafter. The reliance of the plaintiff is that the amounts so paid were inadequate and did not represent the proper tonnage, and that, when received by it and its predecessors, it had no notice of their inadequacy. The plaintiff, in support of this claim, introduced the evidence of four mining engineers, Adams, Huckabee, Bryant, and Witt. Their testimony tended to show that 32,000 tons or more were extracted from the mine for which no royalty was paid the plaintiff. This royalty is claimed to have been due for coal mined altogether on the west side of the main slope of the mine. The engineers who testified for plaintiff arrived at their conclusions from an examination of the mine and measurements made by them from the mine map of defendant after the declaration of the forfeiture by the plaintiff. They each made a number of visits to the mine, not exceeding three in the case of any one, and not longer in duration than two or three days in all. From these visits they determined the thickness of the seam of coal and measured certain coal shown by defendant's mine map to have been still in the mine, but which they determined to have been extracted, and corrected the mine map of defendant to this extent. After correction, they determined by instrument the area mined over by acres and the yield of coal in tons per acre, and, from these facts, the aggregate extraction. The defendant introduced the testimony of engineers, who seem equally qualified and probably had better opportunities than did those of the plaintiff. They differed with the conclusions of the plaintiff's engineers in their measurement of the area mined over and of the thickness of the coal in the vein and the amount of rash. The defendant also relied on evidence tending to show that the maximum extraction in the vein which was mined by it was from 70 to 75 per cent. of the coal in place under proper mining methods, and that the western part of the mine had been prop-

erly mined. The plaintiff relied on a declaration of defendant's employés to the effect that 90 or 95 per cent. of the coal had been extracted. These declarations of defendant's agents were, however, if proven, competent only for the purpose of impeachment, and not as independent testimony.

The estimate of plaintiff's engineers of the total extraction varied from 154,000 to 171,000; that of defendant's experts was about 127,-000. The amount of tonnage on which royalty was paid was 121,000.

The evidence is persuasive that, at the time the various estimates were made, accurate surveys and measurements in the mine of a large part of the territory had become impossible by reason of the abandoned condition of the mine and the difficulty of access. Approximation, with large liability to substantial error, was the utmost obtainable even by skillful engineers, and this would require time and diligence. These handicaps to accurate results operated against all the experts. It seems incredible that even approximately accurate results could have been reached in the short time employed by most of the experts over so large a territory by measurements or surveys actually made in the mine. For the aggregate extraction reliance is placed by all the engineers on computations of area made from the defendant's mine map, and not from surveys of the territory mined over. The inaccuracy of the map in showing coal in the mine in certain locations, which had, in fact, been extracted, is demonstrated. The method of extending it some time after the work was done naturally gave rise to error. The utmost that can be said of the map is that it was an approximation. The basis of all the computations being the mine map, its inaccuracy is fatal to their accuracy. The engineers also reached substantially different results in computing the area from the map according to the method adopted by them respectively. I think one of the engineers for the plaintiff erred in failing to allow anything for rash left in the mine, and that another adopted an excessive percentage of extraction in assuming an extraction of 95 per cent. of the coal in place after allowing for rash. In view of the meager opportunities the engineers had to obtain accuracy, and in view of the decidedly conflicting results reached by them, the natural inclination is to turn from the expert evidence as to quantity mined and look to the evidence tending to show quantities mined by actual weights at the tipple of the coal actually mined and brought to the tipple scales. If a reasonably fair and accurate system of accounting for the quantity of coal in this way is shown to have been in force during the period covered by the suit and administered in good faith by defendant, the results shown by it are entitled to more credit than the opinions of experts arrived at under great difficulties and which are conflicting.

The evidence in this respect tends to show the coal was mined and loaded into cars in the mine, was hauled to the tipple, and there weighed, except such as went to defendant's boilers or was furnished to its employés for their use, which from the physical situation of the mine it was impossible to weigh before delivery, and which was estimated. At the tipple scales the defendant had a weighman, and the

coal diggers whose wages were paid by the ton employed a check weighman, whose duty it was to see that they were allotted all the coal they mined. The check weighman, jointly with the defendant's weighman, weighed all coal that passed over the tipple scales, and estimated all cars that went for boiler or employé use at the close of the day to be of average capacity of the cars of that day of the miner who furnished the cars for the use of the boilers or employés. The tipple weight and these estimates included all coal coming out of the mine, and it was by these weights the lessor was paid his royalties, except for a short time, during which they were paid by railroad weights. All such weights, whether actual or estimated, were concurred in by the check weighman of the miners. whose interest was adverse to that of defendant but identical with that of the lessor, and whose sole duty it was to see that the tipple weights represented the aggregate of all coal mined in the mine. The weight sheet, including the coal so estimated, was publicly exhibited on each succeeding day for inspection by the miners, for their criticism and for the purpose of corrections. Royalties during the period in controversy were paid by defendant on a like basis to the Alabama Mineral Land Company, another lessor of lands included in the same mine, and during part of it, to the Tennessee Coal, Iron & Railroad Company, which was a joint owner in part of the lands of plaintiff until 1906. It seems inconceivable that this system, under these circumstances, could fail to be attended with approximately correct results. It eliminated all chance for willful deception or defrauding of plaintiff in the matter of weights, unless aided by collusion by and between the check weighman of the miners and defendant, and probably as well between defendant and its others lessors, where such collusion was inimical to the interest of such parties and so cannot be presumed.

But the plaintiff says that the defendant's own statement of the disposition of its coal shows the inaccuracy of the tipple weights. It is true that the defendant, according to its own statement, disposed of 5,614 tons more coal by railroad shipments and for use under its boilers and for its employés than its tipple weights showed were received from miners. One or the other of its statements is bound to be incorrect, for it could not have disposed of more coal than it mined. Its output for the eight years during which this discrepancy was created was 1,100,000 tons. The error, which was in the total output and not alone in that part from plaintiff's lands, was approximately one-half of one per cent. of the output, and while seemingly large, when considered relatively to the output, is small. It was the result of not a single calculation, but probably hundreds of thousands, extending over eight years duration, when a small error in each would multiply into a large error in the aggregate. One suggested explanation for it is that the estimate of boiler coal for tipple weights was arrived at differently in the statement of disposition of coal from that of receipt of coal at tipple, in that it was averaged each day according to the capacity of the individual miner as shown by his that day's other cars in the latter; whereas, in computing its amount in accounting for its disposition, a monthly average of car weights of all miners was used part of the time, and the balance of the time the estimated coal con-

sumption of the boilers for the work done by them during the period was used as a basis. It seems clear that the tipple weight was likely to be the more accurate in this respect, and it was the basis used in computing royalties. Another suggested explanation is the difference from the rated tare weight of the railroad cars into which the coal was loaded and their actual tare. Accretions would increase the actual tare over the stenciled tare, and less coal would be required to make the shipment weight for that reason. It seems difficult to reconcile any large part of a discrepancy of 5,600 tons in this way; but, when it is considered that an output of 1,100,000 tons represents 100,000 cars of 20,000 pounds capacity, a small error in each rapidly assumes magnitude, and the errors in this respect would probably almost exclusively favor the shipper. Another cause of discrepancy was the difference in size between the tipple and track scales, with which the weighing was respectively done. In all these respects, accuracy probably favored tipple weights. The custom of this mine and others in the district was to credit the miners with even hundreds only on the weight sheet, giving credit for the nearest hundred to actual weight of car, and not to credit them with any coal in any mine car in excess of 3,700 pounds. A similar custom prevailed universally throughout all coal mines in the district. This custom would also tend to create a discrepancy between tipple and railroad weights; the latter being credited with actual weight of all coal mined. The custom of not giving credit for the excess over 3,700 pounds in any car would always operate against tipple weights as compared with railroad weights. The other custom might operate in favor of either the one or the other. It is true that the tendency from shrinkage and evaporation of moisture would tend to reduce this discrepancy to some extent; but the coal is shown to have been handled so promptly from the tipple scales to the track scales that this element would probably be inconsiderable.

Plaintiff also calls attention to the fact that the loss from washing the coal from April 1, 1909, to March 31, 1910, during which time the washer was in operation, is not fully accounted for in the statement of shipments for that period. The mine cars were weighed before the coal was washed, so that the miners and lessors were paid royalty on the basis of unwashed coal; but the argument is sound that the railroad scale weights should show the loss due to washing the coal, in its comparison with tipple weights, since the material eliminated by washing passed over the tipple scales and did not pass over the track scales. This loss is variously estimated by defendant's witnesses; one placing it as high as 20 per cent. of the washed coal. The statement of weights of shipments shows that from the time the washer went into operation in April, 1909, to the date of the declaration of forfeiture in April, 1910, the gain previously shown in favor of railroad weights over tipple weights, averaging probably 250 or 300 tons a month, had not only disappeared, but had given place to an equal gain in favor of tipple weights over railroad weights. This shows that defendant's statement of coal disposition reflects the effect of the operation of the washer. The plaintiff's contention is that it does not sufficiently reflect it in view of the estimated percentage of

loss by washing, and this is certainly true if the percentage testified to by at least one expert is correct. A loss of practically one-eighth of the output of a mine by washing the coal would seem prohibitive to mining, when it is considered that this lost material has to bear on a like basis with the good coal, the cost of mining, haulage, and royalty. The effect of the washer, taking into consideration the previous gain in favor of railroad scale weights, which was overcome and a like balance established on the other side, would, as I figure it, account for a loss of from 3 to 5 per cent. in washing. The amount of loss in that way is conceded to be largely conjectural, and some of the evidence sustains a loss no greater than indicated, and it seems to me the more conservative estimate, in view of the excessive loss to the operator upon the higher basis.

The plaintiff also contends that the coal estimated as used for the boilers is too small for defendant's requirements. It seems to bear a proportion to the output, increasing and diminishing with it, at least in a general way, and the evidence fails to disclose the proper boiler requirement for defendant.

The last two sources of error do not enter into the computation of coal on which payment of royalty was based by defendant, but only go to discredit the correctness of tipple weights as compared with railroad weights. As stated, I think the tipple weights were less likely to be in error than the railroad weights.

While comparison between the statements of the receipt and disposition of coal shows substantial discrepancy, it is such as, in my opinion, would naturally arise in the weighing of over a million tons of coal over a period of eight years under similar conditions and with like causes. I think the system of weighing the coal at the tipple was fair to the lessor (except possibly the failure to credit coal in excess of 3,700 pounds on any car), as it undoubtedly was considered to be by the miners, and by the other lessors; and that the discrepancies pointed out are not sufficient to show either a negligent or fraudulent management or conduct of it, but are such as are incident to similar transactions conducted by human beings liable to err.

The error in the defendant's mine map is not to my mind evidence of deceit or fraud. The only part played by the mine map in the defendant's assessment of royalty was the location of the working places of the miners according to property lines as between the different lessors, and the error pointed out would not affect this in any way. Royalty was paid for all tonnage that passed over the tipple scales, although the mine map showed such tonnage as still in the mine. The defendant knew that plaintiff and its predecessors on more than one previous occasion, not satisfied with the defendant's map, had employed engineers to verify it by surveys in the mine, and could hardly have expected to deceive plaintiff by an incorrect map. The error appears to me the result of mistake or neglect of the mining engineer. The estimate of plaintiff's expert Bryant is that 32,000 tons were mined by defendant without payment of royalty. Upon this amount the royalty would be $2,140, which accrued during a period of over six years, making an annual deficit in the payment of royalty of about

$350. It is inconceivable that the defendant for so insignificant an amount, compared to its total business, would have been induced to falsify its maps and books, for the purpose of so defrauding its lessor. I am impressed with the view that error in the amount of coal on which royalty was paid was that ordinarily incident to multiplied small transactions and was large in the aggregate only when considered out of relation to the total transactions of which it forms a part. The smallness of the discrepancy, when compared with defendant's total business, disarms suspicion of intentional fraud, as does the acquiescence of the miners and the other lessors in the system adopted, and that · of plaintiff and its predecessors for years before the declaration of the forfeiture by it.

[2] The alleged failure to pay royalty, unless intentional or fraudulent, or due to the insolvency of the lessee, ought not to work a forfeiture, since the plaintiff can be fully compensated by a decree for the amount unpaid. In this case, the defendant has paid each installment of royalty on the belief that it was fully paid, and the plaintiff has so accepted it; and the defendant now submits itself to the jurisdiction of the court to make good any deficit found against it. To enforce the declared forfeiture, under such circumstances, unless the failure to pay in full was due to intentional fraud, the defendant being both solvent and willing to pay the deficit, would be against authority and equity.

The plaintiff asserts that the purpose of the bill is not to enforce a forfeiture, but to remove a cloud from its title and enjoin trespasses on its property by defendant, and that the forfeiture was complete before the filing of the bill. It is true that the forfeiture was declared by plaintiff before the filing of the bill, and defendant notified thereof. However, the plaintiff was unable to make the forfeiture effective by re-entering and taking possession of the leased estate and ousting defendant therefrom, and, in order to enforce the declared forfeiture by regaining possession, filed the present bill. Its purpose is to enforce the forfeiture; the plaintiff being unable to avail itself of it without resort to a court of equity.

In the case of Root v. Johnson, 99 Ala. 90, 10 South. 293, the court said:

"It is well settled that forfeitures are not favorites in equity, and, unless the penalty is fairly proportionate to the damage suffered by the breach, relief will be granted when the court can give by way of compensation all that could be reasonably expected."

In Southern Pacific Oil Company v. Edgell, 48 W. Va. 348, 37 S. E. 596, 86 Am. St. Rep. 43, the court said:

"A court of equity will often relieve a tenant from an attempted inequitable forfeiture unless the tenant's breach was willful, and particularly when the breach or default was a result of accident or mistake."

Being of the opinion that there was no intentional or fraudulent default on defendant's part in payment of royalties, and that such error as may exist was due to mistake, of a character incident to a like business, no forfeiture should be enforced against defendant for this default.

Coming to the question of the amount of royalty unpaid at the time of the declaration of forfeiture: Plaintiff was paid 224 tons in excess of the amount shown by tipple scale weights. The defendant is shown to have benefited by 5,614 tons in excess of tipple scale weights. Of this excess 2,075 tons is shown to have accrued before any mining was done on plaintiff's lands, leaving the excess in which plaintiff is entitled to share 3,539 tons. This is the excess from the time mining commenced on plaintiff's land up to date of forfeiture on total output during that time. Before mining began on plaintiff's land, about 100,-000 tons had been mined by defendant. Deducting this, the total output during the remaining period would be approximately 1,000,000, of which about 121,000 came from plaintiff's land. Plaintiff's pro rata of the excess would be approximately 425 tons, royalty on which would be $14.07. Failure to account for so small an amount presents no case for the enforcement of a forfeiture.

In all respects, except the limiting of weights of mine cars to 3,700 pounds regardless of actual weight, the tipple scale weights seem to be more accurate than railroad weights. The miners having knowledge of and consenting to the general custom of limiting weights are bound by it, as would be true of lessors resident of the district where the custom prevailed. The plaintiff and its beneficiaries being nonresidents of the district, not shown to have been familiar with the custom, and the lease not providing for tipple scale weight as a basis for assessing royalty, it is fairer to use the amount of tonnage disposed of by defendant and of which it received the benefit.

[3] II. The plaintiff relies as a ground of forfeiture upon an alleged assignment or subletting of the lease executed by it to defendant's predecessors in title, based on two contracts entered into between defendant the Galloway Coal Company, and its codefendant, the Choctaw Coal & Mining Company, one in December, 1906, and one in April, 1909; the two agreements being identical except in their period of duration and the price to be paid for mining the coal. The defendant's answer to this contention is that the agreements are merely working contracts and create the relation of independent contractor, and not that of tenant. The proper construction of the written agreements determines this question. The defendant also answers that any breach that exists has been waived by acceptance of royalty with knowledge of it.

Concededly the contracts are not subleases in form. There is no demise of the premises or of any rights in the premises for the term of the lease or part of it, and there is no agreement to pay rent or royalty. The mining company agrees to do certain work for the coal company, viz., to mine in a workmanlike manner and load on cars at the tipple the coal in coal company's leased or owned lands. In consideration and for the purpose of doing this work, the coal company agrees to furnish its plant and equipment to the mining company, to permit it to exercise the right of the coal company to cut timber for mining purposes, and to pay the mining company a sum based on and varying with the wages paid coal miners for mining coal. The mining company acquires no title to the coal when severed, and conse-

quently pays no royalty or other consideration for the coal in place. It mines the coal company's coal and loads it in railroad cars for the coal company, and for the doing of this work, alone, it receives its compensation from the coal company. No interest in the land or its minerals is vested in the mining company by the contract. A lease by which no interest is conveyed in the demised premises, and by which no rent or royalty is reserved, is an anomaly.

The plaintiff's position is that the agreement places the mining company in possession of the premises leased to the coal company and delegates to it work, which the coal company's lessor was entitled to expect the coal company personally to perform. It is true that the effect of the agreement is to place the mining company in qualified possession of at least a part of the leased premises, viz., the mines and mine improvements of the coal company. Such possession, however, can be acquired by other means than a lease. A building contractor, who contracts to erect a building for another on land leased to the latter, has such quasi possession; but possession so acquired does not constitute him a subtenant of the lessee. The operations of mines or portions thereof are customarily conducted by independent contractors, who have possession for the purpose of the operation of the whole or part of the mines. The fact that the effect of the agreement is to place the mining company in possession of the whole or part of the premises is not, therefore, determinative that it is a sublease, since such possession may be that of an agent or an independent contractor as well as that of a lessee. Boston El. Co. v. Grace & Hyde Co., 112 Fed. 279–286, 50 C. C. A. 239. The contracts in question do not confer on the mining company possession of the miners' houses and commissary on the leased land. Possession of these, as appears from section 7 of the agreement, remains in the coal company. This section also shows clearly that the coal remains the property of the coal company, after severance, since the mining company agrees to collect its price for the coal company from its employés. This would not be true if the contract were a lease.

The plaintiff also contends that the purpose of the covenant against assignment and subletting is to prevent a delegation by the lessee to others of duties for the performance of which the lessor looked to a lessee of his own selection, to whom alone he might be willing to surrender the possession of the premises. Conceding that this was the purpose of the covenant, the covenant would prevent this only so far as it might be accomplished by an assignment or subletting of the leased premises. The lessor might object to possession being surrendered to objectionable servants of the lessee, or to the duties, imposed upon the lessee, being performed by agents objectionable to him; but the lease would not cover such objections, since such delegation would not rise to the dignity of a sublease or assignment. Moreover, the responsibility of the lessee to the lessor is in no way diminished by the contract.

The contract seems to me to be a working contract merely, and not a sublease or assignment of a lease; to create the relation of independent contractor, and not that of lessor and lessee; to provide for

the doing of work and for the payment therefor, and not for the transfer of property or any interest therein.

The covenant against subletting and assigning, when relied upon as a ground for forfeiture, will be given a strict construction in equity.

The evidence in this case shows that, while the mining company is a distinct legal entity from the coal company by reason of non-identical stock ownership, yet its managing officers from the time of its organization up to the date of the declaration of the forfeiture were those of the coal company, it having been organized by the coal company to limit its liability in the event of a mine explosion occurring during operation. No injury has resulted to plaintiff up to date of forfeiture, and a court of equity will not, therefore, enforce a forfeiture; the violation, in any event, being merely technical, and restitution of possession to the lessee affording the plaintiff full reparation for the technical violation, if there was one. Such restitution would be entirely possible, where the control of the sublessee corporation remains with the original lessee.

The conclusion reached by me makes it unnecessary to consider the question of waiver.

III. The third ground of forfeiture relied upon by the plaintiff is the alleged breach of a covenant on defendant's part to mine the coal in a proper and workmanlike manner at all points and in such a way as at no time to obstruct the advantageous working of the property or impair the availability or value of the same in case of reversion to the lessor.

Aside from the features of the case which may be more appropriately considered under the fifth ground, the only evidence that now occurs to me as supporting this ground of forfeiture is that tending to show that the neck of many of the rooms on the entries to the east side were gobbed up. Plaintiff's engineers testified that this would obstruct the winning of the pillars on the retreat. The defendant's engineers, on the contrary, testified that it was customary mining, and that it did not interfere with the drawing of the pillars, since by taking a slab off the entry pillar at the neck of the room, eight feet wide, the inside pillars could be reached without removal of the gob at the neck, and without additional cost or labor. as the pillar thus slabbed would have to be drawn in any event. The evidence does not convince me that the gobbing of the neck of the rooms was an obstruction to the removal of the pillars in the room, so as to constitute a violation of the covenant of the lease. Other charges of improper mining will be considered under the fifth ground of forfeiture.

[4] IV. The fourth ground of forfeiture relied upon by the plaintiff is based upon a stipulation in the lease permitting the use by defendant of the narrow work on plaintiff's lands for the transportation of coal mined on adjoining lands which the defendant might lease or buy, provided such lands were within 2,500 feet of the main slope opened on plaintiff's lands.

In the absence of this provision of the lease, it seems to me doubtful whether defendant would have had the right to use the narrow work on plaintiff's lands for the purpose of transporting coal mined

from other lands. In the case of Hooper v. Dora Coal Mining Company, 95 Ala. 235, on pages 238, 239, 10 South. 652, on page 653, the court said:

"The right to use the surface, implied from the reservation or grant, arises. from and ceases with the necessity of the case. When all the subjacent ore is dug and removed, and the mine is exhausted, there exists no longer any necessity for the use of the surface. Without an express reservation in the grant, the right to use the plant erected on the surface of complainant's land for the loading and transporting of coal mined on adjacent land does not exist. Midgely v. Richardson, 14 M. & W. 595."

However this may be, in the lease under consideration the grant of the privilege to use the narrow work is express, and the extent of it is to be measured by the terms of the express grant. The lessee, by accepting the privilege, accepts it under and as limited by the terms of the grant. It becomes, then, important to ascertain the meaning of the restriction placed upon the privilege by the language of the lease. To do this, the situation of the parties executing it is to be considered.

The original lessees, the defendants Moore and Campbell, negotiated the lease with plaintiff's predecessor at the same time they negotiated a similar lease with the Alabama Mineral Land Company. The lands described in both leases adjoined and bodied up so as to make together a single mine. Each was essential to the other. The manager of the Alabama Mineral Land Company negotiated both leases, one for his company, the other probably acting for both lessor and lessees. Both lessors knew that the two leases were being executed practically as one transaction, and that the lessees could not get along without both tracts of lands. It is a fair inference that plaintiff's predecessor in title knew the character of his lands and their physical situation, and that they could not be operated and developed as a separate proposition, but only in connection with other lands; all of which appears without conflict from the evidence. If so, he knew how alone access could be obtained to the minerals and the proper location of the only slope that could develop the lands. The map, in connection with the evidence, shows that no slope with entries only 2,500 feet long on each side could have been located on the lands described in either of the original leases so as to develop all the coal on the lands described in them.

The lessors, desiring to accomplish the full development of the leased lands, will be held to have contracted with this in view, and any clause of doubtful meaning in the lease will be construed with reference to this intention, if its language permits. To give the clause under construction the meaning contended for by plaintiff would have made it impossible for the defendant to have mined the coal in the quarter section east of the joint ownership lands, and which is included in the original Alabama Mineral Land Company lease, from entries driven off from the slope, in its present location, which the evidence shows is the only possible location for it. All of this quarter section is more than 2,500 feet from the main slope opened on the lands of plaintiff. The language of the restrictive clause is:

"Said lessees may use during the life of this lease any slopes, headings, entries and passage ways through, over and across the lands included here-

in, for the purpose of reaching, giving access to or mining *on any other lands which they may lease or buy*, provided *said lands* are within 2500 feet of the main slope opened on the lands embraced in the lease."

"Other lands which may lease or buy" means *bodies* of lands such as might thereafter be secured by the lessees. The lands, so leased or bought, are required by the restriction to be within 2,500 feet of the slope. Lands are ordinarily said to be within 2,500 feet of other lands when their nearest boundary is that close. The lease does not say that no coal mined from other lands can be transported through the narrow work on plaintiff's lands unless it is mined within 2,500 feet of the main slope. It provides that no coal mined on lands, leased or bought by defendant, which said lands are more than 2,500 feet from the main slope, can be so transported. The language of the proviso admits of a construction which best fits the meaning of the parties, as determined by their situation at the time the two leases were executed. The coal mined from any lands, which could be developed from the slope opened on plaintiff's lands, and the nearest boundary of which was within 2,500 feet or less from the main slope, was coal mined from other lands, leased or bought, which were within 2,500 feet of the main slope so opened, within the meaning of this clause of the lease.

This would be true whether such lands were secured through the original or amended lease of the Alabama Mineral Land Company. The parties contemplated the opening of a mine, not the development of the respective lands of either, apart from the other, or apart from such additional lands as were physically necessary to the complete development of the mine from an opening suitable to the development of the coal on both tracts of leased land. **If,** after having so opened a mine, it became necessary, in order to accomplish its full development, to secure additional lands, the lessors will be held to have contemplated that the lessees should have this right. The limit has reference, not to the source or time of acquisition of the lands, but to the necessity of acquiring and using them for the full development of the mine opened on the land of the original lessors. Coal mined from any lands, whenever secured, that were necessary to the full development of the mine opened under the lease, and the nearest boundary of which was within 2,500 feet of the opening, comes within the description covered by this stipulation of the lease.

The defendant has mined coal in section 6, the right to do which was secured from the Alabama Mineral Land Company by the amended lease of 1906. The nearest boundary of the lands in section 6 is more than 2,500 feet from the main slope opened on plaintiff's lands. The use of the narrow work of the plaintiff in section 7 to transport coal mined from the lands in section 6 is not justified by the grant of the privilege, as restricted by the terms of the lease. The authority to use the narrow work in the joint ownership lands in section 7 for this purpose cannot be deduced from the subsequent lease to defendant from the Alabama Mineral Land Company, the present joint owner with the plaintiff in these lands.

The cases seem to distinguish between the use of joint lands by one

tenant in common or his licensee and the grant of an easement by one tenant in common in the joint lands for the benefit of other lands. There seems to be a sound reason for the distinction. The former is a mere use of the land; the latter is a conveyance of an interest in it. Each tenant is entitled to the separate use, though not to the exclusion of his cotenant. Neither tenant has the right to destroy the entire estate by transferring or incumbering it. The granting of a license or easement for the benefit of other lands or their owner is in no just sense a use of the common lands. This contention, even if sound, would not authorize the use of that part of the slope opened on plaintiff's lands in section 18.

[5] The question then is whether the use of the narrow work for this unauthorized purpose will justify a court of equity in enforcing a forfeiture for breach of covenant, express or implied, or, if not, enjoining the future use of the narrow work as a trespass.

Irrespective of whether the restrictive clause is a covenant, express or implied, for the breach of which, resulting in substantial injury to the plaintiff, a forfeiture would be enforced, and a declared forfeiture not relieved against, it seems to me, the objection to such relief in this case is that the plaintiff has suffered no substantial injury from the use of its narrow work for this purpose. There is no contention that the mere use of the narrow work causes plaintiff substantial injury. The argument is that the drawing of the pillars in entries so used on the retreat has been delayed to afford the defendant an opportunity to use the entries for this unauthorized purpose, to the substantial damage of the plaintiff. If not justifiable, this delay would constitute a breach of the covenant to properly develop the mine. The injury complained of would be due, not to the use of the entries for this purpose, but to the failure of the defendant to properly develop the mine by extending it too far east and not coming back with the pillars soon enough. If the covenant to develop properly has not been breached by defendant, no substantial injury has been suffered from the use of the entries. If this covenant has been breached to the substantial injury of plaintiff, then a forfeiture should be enforced for the direct breach of that covenant. No other substantial injury resulting, this use of the narrow work, though unauthorized, would not justify the forfeiture. The reasonable value of the user would be full compensation for the injury, and in such case the award of such compensation takes the place of the enforcement of a forfeiture as the proper measure of relief. Root v. Johnson, 99 Ala. 90, 10 South. 293; 12 Am. & Eng. Encyc. Law, 758; Davis v. West, 12 Ves. 475.

The plaintiff also contends that, if not entitled to an enforcement of the forfeiture for this breach, it is entitled to an injunction against any future and unauthorized use of its narrow work. The writ of injunction is not issuable as a matter of right. The comparative injury and benefit which may ensue from its issuance to the respective parties and to the public is to be considered by the court, even where the plaintiff's legal right is established. If the benefit to plaintiff from the writ is small, when compared to the injury to defendant or to the public, and the injury to plaintiff can be adequately compensated in

an action at law, relief by injunction will be denied, and the plaintiff will be left to his remedy in an action at law. 1 High on Injunctions, § 1106; Berkey v. Berwind White Coal Co., 220 Pa. 65, 69 Atl. 329, 16 L. R. A. (N. S.) 851; State v. Judge, 51 La. 1768, 26 South. 374; James v. Bondurant (Iowa) 86 N. W. 274; Robinson v. Clapp, 67 Conn. 538, 35 Atl. 504, 52 Am. St. Rep. 298; Lloyd v. Catlin Coal Co., 210 Ill. 460, 71 N. E. 335; Lynch v. Union Inst. Co., 159 Mass. 306, 34 N. E. 364, 20 L. R. A. 842; Cobb v. Mass. Co., 179 Mass. 423, 60 N. E. 790; Chartiers Co. v. Mellon, 152 Pa. 286, 25 Atl. 597, 18 L. R. A. 702, 34 Am. St. Rep. 645; Kansas v. Colorado, 206 U. S. 46, 27 Sup. Ct. 655, 51 L. Ed. 956; Southwestern Co. v. La. El. Co. (C. C.) 45 Fed. 896; Clifton Iron Co. v. Dye, 87 Ala. 470, 6 South. 192.

Apart from the claim of indirect injury due to the suspended development of the mine to be considered hereafter, the continued use of the narrow work by defendant will cause plaintiff no substantial injury. Payment of a sum which would be reasonable value of the user would entirely compensate plaintiff for all the injury suffered from such use. The evidence shows that the extension of the entries further into section 6 is limited by the fact that the middleman is thickening to such an extent that the coal cannot be profitably worked much farther from both benches, and hence not from the Garnsey side; the size of the Garnsey cars prohibiting development from that side, after the point is reached when but one bench can be profitably mined. The territory where two benches are mined cannot be profitably mined from the Savage creek slope. It is to the interest of the public, as well as of the Alabama Mineral Land Company and the defendant, that what coal cannot be recovered through the Savage creek slope should be recovered through the Garnsey slope; for otherwise it will be lost. It can be mined through the Garnsey slope only through the use of the narrow work on the joint ownership lands. Balancing the comparative injury suffered by plaintiff from permitting the continued use by defendant of the narrow work on the joint ownership lands until the coal properly minable through the Garnsey slope has been exhausted, with the injury to the public, the owner of the land under which this coal lies and his lessee, the defendant, from restraining it from being mined, I think no injunction should be granted, at least until the expiration of a sufficient time to complete the mining of that part of the seam from which both benches are mined, provided the period required for so doing is not an unreasonable one. In the meantime the cause may be retained for the assessment of compensation for past and future user of the plaintiff's narrow work, when the court has been furnished sufficient data to determine the reasonable value of the user, and with leave to the plaintiff to renew his application for an injunction, either in this or a subsequent proceeding, if such user be continued beyond the period indicated. This period seems to be in sight, as the evidence shows that fifth east entry has practically reached its eastern limit at the present time.

The interest of the public, in having provided for the safety of its miners employed at Savage creek an additional opening into the Savage creek mine from the Garnsey mine, justifies the court in refusing to enjoin the use of the narrow work for the extension of one entry, at least until it meets the corresponding entry from the Savage creek side; providing compensation to plaintiff upon a like basis for this additional user.

[6] V. The plaintiff also claims a forfeiture because of the alleged breach of the covenant of the lease requiring the lessee to work the mines continuously with reasonable diligence or for their best development. The breach relied on is that the mines have not been worked for their best development, in that the east side has been developed farther than it should have been on lands other than those of the plaintiff, causing damage to the plaintiff in that (1) the retreat from the east side has been thereby unduly delayed, and (2) the development of the west side, largely consisting of plaintiff's lands in section 18, has been thereby unduly retarded. Plaintiff's contention is that its beneficiaries have been deprived of current royalties, which they would have been entitled to receive under a proper development, and that they will lose coal or the royalties on it that would otherwise have been recovered, because the lessee will be unable to reach it during the unexpired term of the lease, and because the value of part of it (that contained in certain pillars on the east side) has been destroyed by the pillars taking weight owing to the delay that has occurred in drawing them on the retreat.

The purpose of the covenant requiring the working of the mine for its best development was to insure the plaintiff's beneficiaries the receipt of adequate current royalties during the term and the exhaustion of all the coal possible before its expiration. Interest on deferred royalties would not entirely compensate for such disappointed expectations, since it may be presumed the receipt of current royalties was relied on by the lessors as a means of livelihood. The importance of getting out all the coal a proper development would secure is accentuated by the showing that a large part of the coal will be forever lost, unless mined during the term of the lease and through the Garnsey slope. A breach of this covenant of the lease is expressly made a ground of forfeiture.

The situation of the original lessor and lessees at the time of the execution of the lease shows that it was never contemplated that the plaintiff's lands should be developed as a single mine, independent of other lands. The lessor was aware that adjoining lands surrounding his were being leased by the original lessees at the same time and as a part of the transaction. The lease itself provided for the use of his narrow work to facilitate the mining of coal upon lands other than those leased by him. It also prohibited the use of lessor's timber for mining purposes on any lands other than his own. The best development was exacted, not for the lands of the plaintiff, but for the mines to be opened and operated by defendant. By "mines" in the leases is meant the instrumentality by which the body of coal was to be taken out from under the lands of both lessors. The unit of best develop-

ment created by the leases was this instrumentality as distinguished from the lands of either or both lessors. In fixing the mine as the unit of best development, the parties to the lease must have contemplated the use of the mine by the lessees for the extraction of all the coal naturally tributary to it, and which could be best developed through it, without regard to the time of acquisition by the lessees of the coal or the right to mine it; the limit of best development being determined by topographical and physical considerations, rather than by the accident of ownership at the time the lease was executed. If the defendant has properly located its mine to develop the coal in the leased lands of the lessors, and if there is coal, not covered by either lease, which is naturally tributary to the mine so located, and which can be mined only through and by means of it, the fact that defendant was not the owner of such coal when the original lease was executed ought not to exclude it from development through said mine, when it is afterwards acquired. The parties will be held to have contemplated the probable acquisition by the lessees for this purpose of all coal which the mine, according to best methods of mine development, would naturally reach. This is a proper method of construction when applied to leases made as part of a plan of bodying up coal lands of different owners for development as a single mine.

The inquiry, then, is whether the defendant has mined on the east side any coal not properly tributary to the mine it opened, located according to the best mining methods, and thus wrongfully delayed the retreat. The evidence clearly shows that the coal under the lands of the two lessors covered by the original leases could only be mined from a slope located as the Garnsey slope is. It also shows that the lay of the land prevented this slope from being driven with symmetrical entries of approximately equal length on either side. The nearness of the property line on the west foreshortened the entries on this side as compared with those on the east. On the east side, the only other possible location for a slope was at Savage creek, two miles away. The coal lying between the Garnsey slope and the Savage creek slope, if mined at all, is required to be mined through the one slope or the other. The seam of coal consists of two benches. On the Garnsey side, each bench is thick enough to be profitably mined. On the Savage creek side, the lower bench is so thin and the valueless middleman so thick that only the upper bench can be profitably mined. The differing height of the entries in the two mines, due to this change in the seam, makes it impossible to use the same kind of mine cars in each mine. The Savage creek mine cars are much smaller than the Garnsey cars. There is thus a natural line between Garnsey and Savage creek, limiting the possibility of mining beyond it from either mine. The coal on the Garnsey side of this line, if recovered at all, must be recovered through the Garnsey mine, and its best development would, according to the evidence, include the extraction of the coal up to this line in spite of the long haul. The evidence is convincing that, apart from the question of separate ownership, the coal up to this line was properly developable only from the Garnsey mine.

So far as this coal lies under the lands covered by the original lease

of the Alabama Mineral Land Company, it is inconceivable that the parties did not have in contemplation the development of it from the Garnsey slope, since the two leases were part of one transaction, and the lessors are bound to have known that the lands in both leases were to be included in the single mine, which each lease required the lessees to work for its best development. So developing this mine as to lose 160 acres of coal would not be the best development. One hundred and sixty acres of this land lies east of the joint ownership lands, and is reached only through the narrow work on those lands. If this coal is ever to be extracted, the pillars in those entries must be left intact until such extraction has been accomplished, for otherwise the coal beyond cannot be mined. The pillars cannot be drawn on the retreat until all the coal behind has been taken out. If the proper and best development of the mine included the extraction of this coal, then the plaintiff cannot complain of any delay in retreat which was made necessary to win this part of the coal, which the best development of the mine required to be extracted. The lessees owed the duty to the Alabama Mineral Land Company to extract this coal, under the lease which was the counterpart of the plaintiff's.

Defendant has extended its entries, however, beyond the lands secured to it by the original lease of the Alabama Mineral Land Company into lands in section 6, covered by a second lease made to it by that company in 1906, and long after the execution of the lease involved in this suit. The entries, so extended, also pass through the joint ownership lands. The workings of the defendant, according to the evidence, have not yet reached the line where the seam cannot be mined profitably from the Garnsey side, though closely approaching it; the fifth east entry having probably just reached this line. In view of the conclusion expressed, the defendant is within its rights in developing the coal in section 6 through the Garnsey mine so long as it does not extend its workings beyond the line where the mining of both benches of the seam ceases to be profitable. The plaintiff has therefore no ground for complaint because of the delay in the retreat caused by the working of the coal beyond the joint ownership lands, either in section 7, covered by the first lease, or in section 6, covered by the second lease.

Under this view, the use of the narrow work in the slope and in the joint ownership lands by defendant to transport coal from these lands, though more than 2,500 feet from the slope, and though unauthorized, cannot be said to have injured plaintiff by delaying the retreat, since the delay in retreat has been made necessary by defendant's authorized mining in the lands in section 6, acquired by the amended lease. The same delay in retreat would necessarily have occurred even if the entries on the joint property had not been used for such transportation, and hence such user of them cannot legally have caused the injury due to the delay in retreat.

This disposes of the claim so far as it relates to the development of the east side of the mine.

[7] The plaintiff also relies on a failure to properly develop the coal on the west side under its lands in section 18. The disproportionate development of the west to the east side is apparent from the

map. So far as it is due to the proximity of the property line to the slope, it affords the plaintiff no ground for complaint, since the slope is shown to have been properly located, and the closeness of the property line to it necessarily shortened the entries. The development of the west side, however, has not been carried to its possible limit, and this is conceded by the defendant. The excuse for the limited development of this part of the mine offered by defendant is the inferior character of coal on this side of the slope. The evidence as to the quality of coal on this side of the slope is conflicting. I conclude from the evidence that the coal in the eighth and ninth west entries and at the face of the slope is of inferior quality, and, by itself, unmerchantable. The lease requires royalty to be paid on all coal of every quality and description mined by defendant, which includes all coal loaded out of the mines, whether merchantable or not. The lease does not require the defendant to pay for unmerchantable coal, not received by it in this sense. This was decided of a similar stipulation in the case of Gaines v. Virginia & Alabama Coal Company, 124 Ala. 394, 27 South. 477. Nor would the defendant be required to lower the quality of merchantable coal from other portions of the mine by mixing it with the coal mined elsewhere that was not merchantable, though the mixture could be marketed at a sacrifice in price. The evidence also reasonably convinces me that, at the time development was stopped on the west side, the appearance of rash in the eighth and ninth west entries and at the face of the slope justified the belief that the coal in that vicinity of the mine was inferior and unmerchantable.

The evidence does not reasonably satisfy me that there is no substantial quantity of merchantable coal under the balance of the plaintiff's lands on the west side, or that it would be proper, on the showing made, to permanently abandon development work on that side. The history of the bad coal on this side seems to have been that it occurred in spots. As much as 100,000 tons have been marketed by defendant from the west side during the period of the operation of the mine, and it hardly seems that so large an amount could have been unmerchantable. The inference naturally to be drawn is that the bad coal on the west side is possibly local rather than general. The duty of the defendant is to properly develop the coal under the west side by extending the slope and entries, or show by further exploration of the territory that there is not merchantable coal in commercial quantities therein. For aught that appears at present, the defendant may have reached a bad spot in the eighth and ninth west entries and at the face of the slope and stopped development before and without having sufficiently ascertained that the bad coal extended over such part of the unmined territory on the west side as to justify its complete and final abandonment. Forfeitures for failure to develop properly mines or like properties are even less favored than are forfeitures generally; much being left to the discretion of the operator. In the absence of evidence of fraud or bad faith, such forfeitures will not be enforced. I think the appearances of bad coal on the west side at the time development was stopped on that side relieve the defendant from any imputation of fraud or bad faith in stopping development work when they did. If a breach of this covenant exists, it is due to a mis-

take of judgment only. Willful default or bad faith ought only to be predicated on failure to properly develop the west side after the duty to do so has been made clear to defendant or legally determined. Colgan v. Forest Oil Co., 194 Pa. 234, 45 Atl. 119, 75 Am. St. Rep. 695; Kellar v. Craig, 126 Fed. 630, 61 C. C. A. 366; Benavides v. Hunt, 79 Tex. 383, 15 S. W. 396.

This disposes of all of the grounds of forfeiture asserted by plaintiff.

[8] VI. The bill prays for an injunction restraining the defendant from mining on other seams under the leased lands than the Thompson seam on which its present slope is opened and from which alone the defendant, as yet, has mined coal. The bill fails to show imminency of the threatened evil sufficiently to make a case for the granting of the writ. Counsel unite in requesting a decision of this question without regard for the sufficiency of the bill in this respect, and at their request the matter is considered.

The evidence shows that there are a number of workable seams of coal on the lands of plaintiff other than the Thompson seam; one, the Helena seam, above, and the others below, that seam. The existence of more than one seam on the lands was probably known to the original lessor and lessees; but it seems manifest that the seam which gave importance to the property and induced the lessees to enter into the lease was the Thompson seam, which had been opened by test pits on the leased lands and was already under successful development at neighboring mines. The other seams probably came in for little attention from the parties to the lease. The language of the lease executed to defendant's assignors by the Alabama Mineral Land Company is identical with that executed by plaintiff's predecessor. Each demises and lets to the lessees the right and privilege of mining coal on the land described in it. What coal, the lease does not specify. If these words in the lease are to be given effect at all, they must be construed, when taken by themselves, to mean any coal under the leased lands. If not given this signification, they would be too indefinite to confer any rights at all, for it would be impossible to determine from them in what coal, short of the whole or any part of it, the right of mining was given by the lease. Stopping at this point, the lessees would have the right, at their option and selection, to mine any coal found under the leased lands. The lease could not be made effective otherwise, and a construction that will preserve its efficacy will be preferred.

It is said that the language of the fourteenth section of the lease is restrictive of this general grant. The fourteenth section is as follows:

"In the event that the seam of coal opened on said lands shall fail or be worked out, this contract shall cease and determine; and in case of a continued squeeze or should the seam of coal run into fault, the minimum royalty is not to be claimed during the continuance of such squeeze or fault, and royalty is to be paid only on coal mined, provided that the question as to whether or not fault is of so serious a nature as to materially interfere with the working of the coal, shall be subject to arbitration, if the lessor so requires, by mining engineers appointed as provided in clause 15."

Stress is laid by the plaintiff on this language of the stipulation:

"In the event that the seam of coal opened on said lands shall fail or be worked out, this contract shall cease and determine."

The Thompson seam was opened by prospecting, and to it this language is to be referred.    If the effect of this language is that the lease should determine absolutely upon the exhaustion of the seam then opened on the leased land, the intention to confine the lessees to this seam would be apparent.    The fourteenth section is one inserted for the benefit of the lessees.    This clearly appears from the remaining stipulations of the section, providing that during operations, through a fault or squeeze in the seam opened, minimum royalty is not to be claimed, but only royalty based on the coal actually mined. The purpose of providing for the cessation of the lease upon the exhaustion of the seam then opened was to give the lessees the opportunity of releasing themselves from the payment of minimum royalty in that event.    This operated exclusively for the benefit of the lessees, and, reasonably construed in the light of its purpose, conferred an option on them of terminating the lease when the contingency happened. On the one hand, it was immaterial to the lessor from what seam the lessees mined the coal, provided it was done in a workmanlike manner and the stipulated royalty paid.    On the other hand, it was important for the lessees to protect themselves against payment of minimum royalty during a 20-year term in the event that the only seam, with which they were familiar and which alone they were willing to risk, became exhausted before its expiration.    The natural outcome of this situation of the parties would be a provision authorizing the lessees to withdraw from the lease upon the exhaustion of the particular seam; and this construction does no violence to the language of the stipulation.    So construed, the stipulation conferred on the lessees the election to abandon the lease upon the exhaustion of the Thompson seam, but does not necessarily operate as a restriction upon the generality of the preceding grant to mine any coal under the leased lands.

In the eleventh section, the lessor carefully reserves the right to use the lessee's slopes, headings, entries, and passageways on the leased lands for the purpose of allowing him to get access to and mine coal "in any other lands of the lessor, not included in this lease," and also the right to use the right of way for railroad and tramroads of the lessees to develop "other lands belonging to the lessor, which he may hereafter lease or sell for mining or other purposes," and also the right to use any railroad of the lessees jointly and for a fair consideration in the event of the development "of said lands (those not included in the lease)."    The lessor carefully provides in three different clauses in the lease for the mining of coal by him on other lands than those leased, but studiously refrains from making any provision for the mining by him of any of the remaining seams on the leased lands during a 20-year term.    The absence of any similar provisions caring for the other seams in the leased lands indicates that the lessor considered that he had conferred on the lessees the right to mine all the seams of coal under the leased lands during the lease.

The terms of a subsequently executed lease between the Alabama

Mineral Land Company and the defendant cannot affect the construction of the lease in question. Nor can any practical construction be derived from the failure of defendant to mine on any seam other than the Thompson seam, in view of the fact that the evidence shows that it has prospected the Helena seam with a view of mining it, and that this is the only other seam that has ever been worked by any one in the district.

With the views expressed, a decree will be entered denying the plaintiff the relief prayed for, except for the amount of royalties found to be due and unpaid, and the amount of compensation plaintiff is entitled to for the past and future unauthorized use of its narrow work for the transporting of coal mined in section 6, and to be hereafter determined, and ordering the cause to be retained, if desired by the plaintiff for the renewal of its application hereafter as it may be advised for injunctive relief against the future use of such narrow work beyond a reasonable time to enable the defendant to mine the remaining coal that may be best mined from the Garnsey side, which is identified by the evidence as that part of the vein which admits of profitable mining from both benches by proper mining methods. The plaintiff is to be taxed with three-quarters of the costs, and the defendant with one-quarter, in view of the proportion of relief granted as compared with that prayed for in the bill.